## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| JERE GRAY, individually and as Mother and Guardian of EG, a Minor, and | ) | |
| | ) | |
| VALERIE KESSLER, individually and as Sole Proprietor of the Jeremiah Mason House Bed and Breakfast, and | ) | |
| | ) | |
| JENNIFER JENKINS, individually and as Mother and Guardian of EJ and AJ, and | ) | |
| | ) | |
| HEIDI SAMPSON, individually and as Representative to the Maine House for House District 21, and | ) | |
| | ) | |
| JANE AND JOHN DOES 1-100, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT** |
| | ) | |
| GOVERNOR JANET T. MILLS, in her official and personal capacities, and | ) | **Jury Trial Demanded** |
| | ) | |
| CENTER FOR DISEASE CONTROL AND PREVENTION DIRECTOR DR. NIRAV D. SHAH, in his official and personal capacities, and | ) | Civil Action No. |
| | ) | |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES COMMISSIONER JEANNE M. LAMBREW, in her official and personal capacities, and | ) | |
| | ) | |
| DEPARTMENT OF ECONOMIC AND COMMUNITY DEVELOPMENT COMMISSIONER HEATHER JOHNSON, in her official and personal capacities, and | ) | |
| | ) | |
| JANE AND JOHN DOES 1-20, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>TABLE OF CONTENTS</u>

**I. SUMMARY OF THE CASE**……………………………………………………4

**II. STANDING, VENUE, JURISDICTION**…………………………………………10

**III. THE PLAINTIFFS**………………………………………………………...11

**IV. THE DEFENDANTS**………………………………………………………...20

**V. STATEMENT OF FACTS**…………………………………………………21

      **A.**     **Chronology**………………………………………………………...21

      **B.**     **There is No Emergency - Even Assuming the Accuracy of**
             **COVID-19 "Death" and "Case" Counts**………………………27

             (1)    Reported COVID-19 Deaths Fall Far Below the Deaths
                    Projected a Year Ago
             (2)    COVID-19 Does Not Threaten the Entire Population -
                    Fatalities Are Limited to a Definable Age Demographic
             (3)    COVID-19 Kills Fewer People than other Causes of Death,
                    for Which No Emergency Has Been or Will Be Declared
             (4)    COVID-19 Has Not Overwhelmed Healthcare Capacity
             (5)    Multiple COVID-19 Vaccines are Now Deployed
             (6)    The Population Has Reached or Is Fast Approaching Herd
                    Immunity

      **C.**     **There is No Emergency - the COVID-19 "Death" and "Case"**
             **Counts are Inflated**………………………………………..............32

             (1)    New NVSS Coding Instructions Unique to the Death
                      Certificates of Individuals Testing Positive for COVID-19
                      Result in the Over-Reporting of Deaths Caused by COVID-
                      19
             (2)    The PCR Test for COVID-19 is Seriously Flawed and
                      Results in False Positive Results at High Cycles
               (3)    Maine CDC's "Case" Count is Inflated by Inclusion of
                      "Probable Cases" and Cases of Persons not Living in
                    Maine
              (4)    The "Case" Count is Subject to Perverse Financial
                      Incentives

      **D.**     **The Defendants' COVID-19 Mandates Are Ineffectual,**
             **and Unsupported by Science or Medicine**……………………44

(1)    The Fallacy of Asymptomatic Spread
(2)    The Futility of Masking
(3)    The Futility of Lockdowns

**E.**    **The Defendants' COVID-19 Mandates Have Wrought More Harm than COVID-19 Itself Has Caused**……………………………..51

(1)    The Economic Crisis Caused by the Emergency Mandates
(2)    The Human Catastrophe Caused by the Emergency Mandates

**VI.  COUNTS**……………………………………………………………...58

**Count I:**      **Declaratory Judgment – Cessation of Emergency**…………..58

**Count II:**     **Declaratory Judgment – Separation of Powers**………………60

**Count III:**    **Declaratory Judgment – Right to Travel**……………………..65

**Count IV:**    **Declaratory Judgment – Free Exercise**………………………66

**Count V:**     **Declaratory Judgment – Political Speech**……………………68

**Count VI:**    **Declaratory Judgment – Takings without Just Compensation**……………………………………………………...71

**Count VII:**   **Declaratory Judgment – Substantive Due Process**…………..72

**Count VIII:**  **Civil Money Damages Pursuant to 42 U.S.C. § 1983**…………77

**VII.  PRAYER FOR RELIEF**………………………………………………77

**VIII.  JURY DEMAND**……………………………………………………...79

## I.  SUMMARY OF THE CASE

> "The wording of the Weimar Constitution was sweet and eloquent to the ear of any democratically minded man.  The people were declared sovereign: 'Political power emanates from the people.' . . . 'All Germans are equal before the law . . . Personal liberty is inviolable . . . Every German has a right . . . to express his opinion freely . . . All Germans have the right to form associations or societies . . . All inhabitants of the Reich enjoy complete liberty of belief and conscience . . .'  No man in the world would be more free than a German, no government more democratic and liberal than this.  On paper, at least."
>
> - William L. Shirer, *The Rise and Fall of the Third Reich*

1.      For an entire year now, the people of the State of Maine have lived under the cloud of a "state of civil emergency" that is a legal construct, a unilateral proclamation by Governor Mills, extended by the Governor unilaterally no fewer than 11 times[1] (the "Emergency").  All this time, the Legislature, controlled exclusively by the Governor's own political party, has been adjourned.  The Governor has declined to exercise her power to reconvene the Legislature.  It could be reconvened by the agreement of all Caucuses in the House and Senate, but the calls of the minority opposition party to reconvene have been rejected, foreclosing any meaningful opportunity for the minority opposition party to assemble, voice political dissent and challenge the Emergency.  All power has been concentrated in the hands of the Governor.

2.      In this political vacuum, with no legislative oversight, the Governor has issued a series of confusing, contradictory, and ultimately arbitrary and capricious Executive Orders[2] predicated upon the Emergency that she unilaterally declared.

---

[1]  Governor Mills' Proclamations can be viewed here: https://www.maine.gov/governor/mills/official_documents/proclamations (last visited March 2, 2021).

[2]  Governor Mills' Executive Orders can be viewed here: https://www.maine.gov/governor/mills/official_documents (last visited March 2, 2021).

Unelected executive agency officials in the Maine CDC, Maine DHHS, and Maine DECD have issued their own alerts, advisories, checklists and plans, and they are equally unclear and arbitrary (the Executive Orders and Maine CDC,[3] Maine DHHS and Maine DECD[4] pronouncements flowing from the state of emergency are referred to hereinafter as the "Emergency Mandates").   The Emergency Mandates are an extensive web of detailed and substantive rulemaking of a kind ordinarily undertaken by a legislature – or at least, through notice-and-comment rulemaking.  Anyone violating them has committed a Class E Crime, punishable by up to 6 months of imprisonment, a fine of $1,000 or both. Businesses can be fined as much as $10,000.

3.      The Emergency Mandates have stripped the people of this State of their fundamental rights and dignity.  Our daily lives are now directly and comprehensively micromanaged by the summary edicts of executive officers.  We have been ordered, under threat of criminal prosecution, to stay in our homes, to shut down our "non-essential" businesses, to mask ourselves, to submit to painful and invasive testing of at best dubious efficacy, and to quarantine and isolate ourselves and our children from others, even our loved ones, for extended periods of time.  We have been excluded from our schools and places of worship, and the form of our worship transmogrified into something almost unrecognizable.  Our access to routine medical care has been cut off.

4.      The proffered justification for this trampling of civil liberties is the SARS-CoV-2 virus, and the COVID-19 disease that it can cause in some of the people it has

---

[3]   Maine CDC Advisories and other documents can be viewed here: https://www.maine.gov/dhhs/mecdc/all-health-advisories.shtml (last visited March 2, 2021).
[4]   Maine DECD COVID-19 Checklists and other documents can be viewed here: https://www.maine.gov/decd/covid-19-prevention-checklists (last visited March 2, 2021).

infected.  When it first appeared in our State in March 2020, COVID-19 was claimed to be new, and reliable data and experience limited.  A year later, however, we are well past the nascent stage.  Conditions on the ground have changed, and we know far more.

5.     The evidence that COVID-19 is not as dangerous as originally predicted has steadily mounted, and is now overwhelming.  Most people who contract COVID-19 have only mild symptoms comparable to those of the seasonal flu.  The Maine CDC reports that COVID-19 has killed 723 Maine residents, representing 0.05% of the State's population.  Further, 98.5% of all Mainers who have contracted COVID-19 have survived it.  COVID-19 does not present the same risk uniformly to the entire population of the State.  Fully 85% of all deaths attributed to COVID-19 have occurred in the 70-and-over age group.  More than 80% of the State's population is not included in that demographic.  No people under the age of 20 have died of COVID-19 in Maine. Approximately 84% of Mainers who are 80 or over and who contracted COVID-9 have survived it, and approximately 94% of Mainers who are 70 or over and who have contracted COVID-19 have survived it.

6.     All life is precious, but these figures and rates do not even come close to approaching the dire forecasts and models presented to the people in March 2020. COVID-19 lags far behind cancer, heart disease, accidents and chronic lower respiratory disease as a cause of death in Maine, and these are conditions for which no emergency has been or ever will be declared.

7.     There are now multiple vaccines in circulation, and over half of Mainers 70 or over have already been vaccinated.  The State's healthcare infrastructure has not been overwhelmed as forecast, even during times of peak rates of infection.  Whereas the

State represented that it had inadequate testing capacity in May 2020, it has since expanded it and claims that 90% of the population can be tested within 30 minutes of their home.  Studies suggest the population may have reached or is approaching the threshold for natural or "herd" immunity.

8.      There are excellent grounds to conclude that the COVID-19 "death" and "case" data reported by the Maine CDC is inflated. The data is driven by polymerase chain reaction ("PCR") testing, testing which has been shown to be seriously flawed, and when administered in accordance with the manufacturer's own guidance produces false positive results in 97% of tests.  The data is also driven by new rules, created especially for COVID-19 and applicable only to COVID-19, for reporting the cause of death on death certificates, which can result in deaths being counted as COVID-19 deaths, even where other fatal, underlying and pre-existing conditions are noted.  The data also includes so-called "probable cases" which allows Maine CDC to count those presenting with symptoms indistinguishable from influenza and a number of other maladies as COVID-19 cases.

9.      Fear-based appeals have been used to manipulate the public and have been the core justification for nearly a year of consistently unlawful behavior by the State.  The people are bombarded by fear messages on television and newspapers, on the Internet, and on flashing highway signs.  It is not easy for the lay public to evaluate or challenge the messaging independently, since it invokes complex science, medicine and statistical analysis.  At the same time, the corporate operators controlling access to the virtual public square have censored those who have sought to present the information and arguments set forth in this Complaint to the broader public.  Plaintiffs and many others

have expressed their genuine fear of retaliation for questioning the mandates, and have overcome that fear in order to bring this lawsuit.

10.     The Emergency Mandates are experimental, unnecessary, and they have caused more harm than good.  There is no obvious or provable correlation between the Emergency Mandates and positive COVID-19 outcomes.   There is no compelling scientific evidence that people without COVID-19 symptoms are transmitting COVID-19 to others.  At the same time, these Emergency Mandates, purportedly intended to protect the people, have triggered their own, far worse, and more costly "epidemic" - of suicide, drug overdose, social isolation, domestic violence, mental health crises, academic failure, furloughed health care workers, imploding consumer spending, unemployment and permanent business closures across the State.

11.     The real "emergency" is not one caused by SARS-CoV-2 or COVID-19. No, the real emergency has been caused by the legal construct of the Emergency itself, and by the Emergency Mandates themselves, and both have precipitated a true constitutional crisis.  A state operated by unchecked police power for an extended time, is a police state.

12.     To date, citing the "precautionary principle," the Court has shown great deference when reviewing the State's exercise of its police powers.  A year after COVID-19 first appeared in Maine, we are no longer in the "nascent stage."  There is a well-developed factual record, and the judicial deference that characterized the Court's early review of certain Emergency Mandates is not appropriate.  As Chief Justice Roberts has said:

> [T]he Constitution principally entrusts the safety and the health of the people to
> the politically accountable officials of the States.  But the Constitution also

> entrusts the protection of the people's rights to the Judiciary—not despite judges
> being shielded by life tenure, but because they are. Deference, though broad, has
> its limits.

S. Bay United Pentecostal Church v. Newsom, 2021 U.S. LEXIS 758 * 4 (internal quotation marks omitted).   Plaintiffs have been grievously injured by these unconstitutional Emergency Mandates.   They ask the Court to grapple anew with fundamental questions about the constitutional limits of the police power of the State, to restore the constitutional order and to preserve and protect their liberties.

13.   As a threshold matter, Plaintiffs challenge the continuation of Governor Mills' Emergency.   They ask the Court, in accordance with Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 442 (1934) ("Whether the emergency still exists upon which the continued operation of the law depends is always open to judicial inquiry."), and Chastleton Corp. v. Sinclair, 264 U.S. 543, 547 (1924) ("A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change."), to examine the underlying premise for the Emergency and the Emergency Mandates, namely, that SARS-CoV-2 and COVID-19 were at the relevant times, and are now, a true public health emergency.   Under Blaisdell and Sinclair, the Emergency and the Emergency Mandates must end, if the underlying emergency has ended.

14.   Plaintiffs also challenge the constitutionality of the Maine Emergency Management Act, as a violation of the separation-of-powers enshrined in Maine's Constitution and the non-delegation doctrine.

15.     Finally, Plaintiffs ask the Court to conduct appropriately tiered constitutional review of the Emergency Mandates that have injured Plaintiffs, to award certain injunctive relief, and to award civil money damages under 42 U.S.C. § 1983.

## II.  STANDING, VENUE AND JURISDICTION

16.     This Court exercises subject matter jurisdiction in accordance with the provisions of 28 U.S.C. § 1331, as this litigation involves multiple claims and issues arising under the 1st, 4th, 5th, 6th. 9th and 14th Amendments to the U.S. Constitution, and related precedent.

17.     This Court exercises subject matter jurisdiction in accordance with the provisions of 42 U.S.C. § 1983, as this litigation involves the deprivation of rights, protections, privileges and immunities secured by the U.S. Constitution.

18.     There is a "case or controversy" within the meaning of Article III of the federal Constitution since *inter alia* neither the termination of the Emergency nor the relaxation or rescission of individual Emergency Mandates can moot the claims for civil money damages asserted under 42 U.S.C. § 1983.  As for the Plaintiffs' requests for injunctive relief, the Defendants can unilaterally increase the severity of previously relaxed Emergency Mandates, or reinstate those that have been rescinded, at any time while the current Emergency persists or is reintroduced.  "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000).

19.     This Court exercises supplemental jurisdiction over related Maine state law claims under 28 U.S.C. § 1367.

20.     Venue lies in this Court under 28 U.S.C. § 1391(b)(1), since at least one Defendant resides in this judicial district, and all Defendants reside in Maine.

21.     Plaintiffs have standing to bring this litigation, since they can establish that (1) they have suffered some actual or threatened injury, (2) the injury can fairly be traced to the challenged actions of the Defendants, and (3) the injury is likely to be redressed by a favorable decision of this Court.  N.H. Lottery Comm'n v. Rosen, 2021 U.S. App. LEXIS 1526 *15-17, quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).

### III.  THE PLAINTIFFS

22.      Plaintiffs are residents of various counties in the State of Maine, and have suffered injuries as a direct and proximate result of the imposition of the Emergency and the Emergency Mandates, which have infringed their civil liberties guaranteed under the U.S. Constitution and the Constitution of the State of Maine.

23.     Plaintiffs are, as follows:

24.     PLAINTIFF EG, a minor, is a resident of Limerick, Maine, and brings this action through his mother and guardian, Plaintiff Jere A. Gray.  Plaintiff EG is 8 years old, and is in the 2nd Grade at Line Elementary School in Limerick.  He suffers from cerebral palsy, attention deficit hyperactivity disorder with autistic tendencies and is quadriplegic.  Cerebral palsy causes severe rigidity of the muscles all over the body.  For the last 6 years, EG has been treated by an integrated team of medical specialists in Boston.  The Boston-based medical team know EG and his complex medical condition intimately.  Their treatment includes a critical medical procedure that is not available in Maine.  Prior to April 2020, EG traveled to Boston with his family up to 4 times a year

for the treatments.  EG also received occupational therapy, physical therapy and speech therapy through Line Elementary. EG was thriving in school, making friends his own age, and learning in the main classroom with neuro-typical students.  With regular treatment and therapy, EG had made great strides.  He was able to move his own body using a posterior walker, and navigate almost independently at school and at home without breaks for as much as an hour without being fatigued and needing other equipment.  Before the treatment and therapy, he could not navigate independently, and was confined to a wheelchair.

25.     The quarantine and COVID-19 testing requirements for interstate travelers in the Emergency Mandates are blocking EG's access to his team of medical specialists in Boston, and stopping his medical treatment.  The lack of treatment increases EG's muscle rigidity and the pain he feels from his condition.  Due to his disability, EG cannot tolerate the masks and face shields required by the Emergency Mandates.  Since EG cannot wear a mask, he cannot receive occupational and physical therapy.  The lack of therapy further increases the pain that EG experiences with his condition.  The pain has interfered with EG's ability to concentrate, and he has cried out in pain at school.  The mask mandates also preclude EG from entering stores in order to be fitted with shoes that will integrate with custom orthotics used to stabilize and align his limbs.  Now, EG is once more dependent upon a wheelchair.  EG is aware of his profound physical regression, and it is causing him to endure severe mental and emotional distress.

26.     EG must have in-person instruction, and cannot learn through a computer. For every 30 minutes during a remote learning session, EG's mother must spend at least 20 minutes of that time helping EG to overcome his resistance to the computer.  When

frustrated, EG will take the computer equipment he is using and attempt to throw it, or shut it off.  EG will lash out at his mother.  As a result of EG's inability to comply fully with the masking orders, his school has removed him from the mainstream classroom, and regularly sends him home from school, triggering mental and emotional overloads that last for hours.  As a result of these deprivations, EG has regressed to a kindergarten level, and is experiencing depression, anger, frustration and social isolation.

27.     The quarantine and COVID-19 testing requirements for interstate travelers contained in the Emergency Mandates have blocked EG's travel to and from Boston, and thereby deprived him of the critical medical care that he needs in order to manage his cerebral palsy.  The masking provisions in the Emergency Mandates have excluded EG from in-person learning at school, and cut off his access to vital therapy that he needs in order to thrive. The Emergency Mandates have violated EG's fundamental right to travel, and his liberty interest in maintaining bodily integrity and associated medical care.

28.     PLAINTIFF JERE GRAY, a resident of Limerick, Maine, brings this action individually and in her capacity as mother and guardian of her minor son, EG.  The quarantine and COVID-19 testing requirements for interstate travelers have interfered with Ms. Gray's fundamental right to travel, thereby blocking her son EG's access to his specialist medical team in Boston, and stopping his medical treatment.  Ms. Gray has endured extreme grief and anxiety, as she has witnessed the devastating effects of the travel restrictions and mask mandates on EG.

29.     PLAINTIFF VALERIE KESSLER is a resident of Limerick, Maine, and brings this action individually and as sole proprietor of the Jeremiah Mason House Bed and Breakfast.  Ms. Kessler watched her parents operate a bed and breakfast for years,

and owning one herself was her dream.  Finally, in October 2019, she used her life's savings and a mortgage loan to invest in the Jeremiah Mason House, a 160 year old, restored Greek Revival mansion with 8 guest rooms, in the village of Limerick, for the sole purpose of operating the Jeremiah Mason House Bed and Breakfast, as her chosen occupation.  She is single, lives alone, and does not need a 3,700 square foot, 8-room mansion for the purposes of housing herself.  The Jeremiah Mason House Bed and Breakfast had been operated in the Jeremiah Mason House successfully since 1996.  Ms. Kessler owns the fee simple title to the House outright.  Bookings started to pile up.

30.     Then the Defendants classified Ms. Kessler's business as "non-essential" and forcibly closed it.  She was not permitted to accept reservations until June 15, 2020.  Out-of-State tourists were outright banned, or as a practical matter prohibited, from traveling to Maine.  Observing a 14-day quarantine period in a hotel room or bed and breakfast The Emergency Mandates required Ms. Kessler to certify a guest's compliance with quarantine and COVID-19 testing requirements for interstate travelers using a prescribed certificate, as a condition to checking them in to her Bed and Breakfast.  Her failure to do so could result in loss of her business license and criminal prosecution.  Guests could also be prosecuted for violating the underlying quarantine and COVID-19 testing requirements.

31.     Virtually all guests who had reserved rooms in Ms. Kessler's Bed and Breakfast canceled their reservations.  She has lost nearly 100% in gross revenues year-over-year.  The Bed and Breakfast is her primary source of income.  She is on the verge of defaulting on her mortgage loan, losing her life's savings, losing the business that was her dream, and, since she lives in the House, losing her own home.  The continuous

uncertainty generated by closures, re-openings, quarantine and testing requirements and other restrictions has devastated her business, which is driven by tourism and advance reservations. She has suffered massive depletion of bookings revenue, some of which was earmarked for maintenance and improvement of the property, and hiring employees.

32.    The Jeremiah Mason House is zoned for commercial use as a bed and breakfast, not for residential use. In order to change the building to residential use, or for use as a boarding house, Ms. Kessler would be required to invest over $180,000 to install a fire sprinkler system and a new heating system. She is on the cusp of bankruptcy, and cannot afford this expenditure. Engineers have informed her that the House might not be able to withstand such extensive construction work.

33.    The Emergency Mandates have deprived Ms. Kessler of all beneficial or productive use of the Jeremiah Mason House, and further they have interfered with her distinct investment-backed expectations. Ms. Kessler has never been compensated for her loss. This business failure has caused Ms. Kessler extreme anxiety, insomnia and depression. Meanwhile, the Emergency Mandates treated similar lodging businesses located in other parts of Maine differently.

34.    PLAINTIFF JENNIFER JENKINS a resident of Portland, Maine, brings this action individually and in her capacity as mother and guardian of her minor children EG and AJ. She is a practicing Roman Catholic. Secular authorities may show "insufficient appreciation or consideration of the interests at stake" when fashioning COVID-19 mandates and assessing their impact on religious liberty interests and free exercise. S. Bay United Pentecostal Church v. Newsom, 2021 U.S. LEXIS 758 * 3.

35.     Thirty states place no restrictions on indoor religious gatherings. Vermont, New Hampshire and Connecticut permit up to 50% capacity.

36.     The Emergency Mandates have set arbitrary gathering limits in Maine's houses of worship, and just as arbitrarily have modified them from time to time.  The limits have ranged from 10 to 50 to 100 at the outer limit, and then back down to 50.  The latest gathering limit, instituted in February 2021, is 5 persons per 1,000 square feet of functionally available space, or 50 persons, whichever is greater.  Fewer than 10 of the 141 Catholic churches across Maine will see capacity rise under this limit.

37.     The limit is absurd when applied to the cavernous Cathedral of the Immaculate Conception in Portland which can seat 700 worshippers, and the Basilica of Saints Peter and Paul in Lewiston which can seat 1,500.  The latest capacity limit permits them to seat only 75 and 105 parishioners respectively.   St. John Catholic Church in Bangor can accommodate 900 worshippers, but only 60 may gather. The Roman Catholic Diocese of Maine includes 250,000 Roman Catholics.  Thus the gathering limits in the Emergency Mandates have cut off Mrs. Jenkins and her children EJ and AJ, and most of the State's Roman Catholics from in-person Mass.

38.     In April 2020, Mrs. Jenkins understood that uncertainty may have necessitated precaution, and made a substantial contribution to the Diocese in order to assist with the acquisition of an upgraded audiovisual system, so that Mass could be live-streamed remotely to Maine's Catholics.  Now, she feels she must stand up for religious liberty.  Saint Pope John Paul II said: "Jesus Christ is present in every liturgical act. Jesus is present when the community comes together to pray and render praise to God.

Jesus is present in the Word of sacred Scripture.   Jesus is present above all in the Eucharist, under the signs of bread and wine."

39.     Roman Catholics believe that the Sacrament of the Eucharist is the "source and summit" of Catholic life because "[i]n the most blessed sacrament of the Eucharist 'the body and blood, together with the soul and divinity, of our Lord Jesus Christ and, therefore, the whole Christ is truly, really and substantially contained.'" Catechism of the Catholic Church (2nd Ed.), p. 346.   Only an ordained priest may consecrate the host in the Holy Sacrifice of the Mass, and the words spoken by Christ at the Last Supper and the action of the Holy Spirit transform the host into the Body of Christ.

40.     The Emergency Mandates have for an entire year distorted the form of the Mass, which is sacred tradition passed down through the ages.   Worshippers must remain 6 feet from other worshippers not in their family, cannot receive the Eucharist on their tongue, and cannot receive the Blood of Christ. There is no choir to sing sacred music. There are no altar servers.   Worshippers are obliged to wear masks at all times during Mass, except for the few seconds when they are actually receiving the consecrated host. By contrast, diners in restaurants may sit at their tables, within 6 feet of other diners who are not in their family, have conversations, laugh, sing, eat and drink, for hours if they wish, as restaurant employees hover within 6 feet, *all while unmasked*.

41.     PLAINTIFF EJ, a minor, is a resident of Portland, Maine, and brings this action through her mother and guardian, Plaintiff Jenifer Jenkins.  EJ is 9 years old.  She is a practicing Roman Catholic.  She completed all of the catechetical requirements for receiving the Eucharist in her first Holy Communion, in 2019, and had anticipated

receiving in the Spring of 2020.  EG, deeply pained that the Emergency Mandates would force her, in that most intimate, personal and sacred moment, to receive her first Holy Communion masked and in the hand, has refused to compromise her beliefs and as a result has been deprived of the Sacrament.

42.     "If Communion is given only under the species of bread, the Priest raises the host slightly and shows it to each, saying, The Body of Christ. The communicant replies, Amen, and receives the Sacrament either on the tongue, or, where this is allowed, in the hand, the choice lying with the communicant."  General Instruction of the Roman Missal (2011 ed.), n. 161.   "[E]ach of the faithful has the right to receive Holy Communion on the tongue…"  Instruction *Redemptoris Sacramentum* - Instruction on Certain Matters to be Avoided Regarding the Most Holy Eucharist, Art. 92.    "The faithful are not to be obliged to adopt the practice of Communion in the hand.  Each one is free to communicate in one way or another."  Congregation for the Divine Worship and Discipline of the Sacraments, Letter to National Conference of Catholic Bishops, Prot. 720/85.   "Certainly it is clear from the very documents of the Holy See that in dioceses where the Eucharistic bread is put in the hands of the faithful, the right to receive the Eucharistic bread on the tongue remains intact…those who restrict communicants to receive Holy Communion only in the hands are acting against the norms…"  Congregation for the Divine Worship and Discipline of the Sacraments, Notitiae (April 1999).

43.     Thus it is the right of the faithful to choose how to worship God at a moment in the Mass that is deeply personal.  It is unconscionable that a well catechized child who wishes to receive her first Holy Communion, unmasked, on the tongue, should

be forced to compromise, in that critical, life-changing moment, about the appropriate treatment of the body of Christ, even as that child has seen with her own eyes and experienced diners in restaurants arbitrarily and capriciously enjoying their freedoms.

44.     PLAINTIFF AJ, a minor, is a resident of Portland, Maine, and brings this action through his mother and guardian, Plaintiff Jennifer Jenkins.  AJ is 10 years old. He is a practicing Roman Catholic.  AJ chose to worship God by being an altar server.  He commenced altar serving in December 2019, as a voluntary next step in his catechesis after receiving his first Holy Communion.  Saint Pope John Paul II, in an address to altar servers, said: "The altar server occupies a privileged place in the liturgical celebration. …Above all, you are servers of Jesus Christ, of the eternal High Priest."  Pope Benedict said that altar servers "rediscover every day that what is happening is something great, that God is coming in the midst of us and that you are able to be close and assist, that His mystery might be celebrated and touch the people."   Surveys of ordained priests show that more than 70% of them had been altar servers.  The Emergency Mandates have stopped altar serving.

45.     PLAINTIFF HEIDI SAMPSON, an individual residing in Alfred, Maine, brings this action individually and in her capacity as a Representative serving House District 21.  She is a Representative to the Maine House, serving House District 21, including Alfred, Limerick, Newfield, Parsonfield and Shapleigh.  Rep. Sampson is a member of the Republican Party, which is the minority opposition party in both the Maine House and Senate.   Since the Maine House adjourned in March 2020, Rep. Sampson has been unable to assemble with her fellow Republicans, in order to question, criticize, challenge and debate the Emergency and the Emergency Mandates, on her own

behalf or on behalf of her constituents, some of which are Plaintiffs in this case, in that most essential public forum for political speech – the Legislature.

46.     Unfortunately, Plaintiffs' accounts are not unique in Maine.  There are many others like them who have suffered unjustly, and are afraid to speak out.  By joining in this lawsuit, Plaintiffs are taking a stand for all others similarly situated. PLAINTIFFS JOHN OR JANE DOES 1-100 are other Maine residents who have suffered injuries as a result of the Emergency Mandates, who may join this lawsuit at a later date.

## IV.  THE DEFENDANTS

47.     Defendants are State officials who reside in Maine.

48.     Defendant Janet T. Mills ("Governor Mills") is, and at all relevant times has been, the Governor of the State of Maine.  Defendant Mills is being sued in her official capacity, and also in her personal capacity.

49.     Defendant Dr. Nirav Shah is, and at all relevant times has been, the Director of the Maine Center for Disease Control and Prevention ("Maine CDC"). Defendant Shah is being sued in his official capacity, and also in his personal capacity.

50.     Defendant Jeanne M. Lambrew is, and at all relevant times has been, the Commissioner of the Maine Department of Health and Human Services ("Maine DHHS").  Defendant Lambrew is being sued in her official capacity, and also in her personal capacity.

51.     Defendant Heather Johnson is, and at all relevant times has been, the Commissioner of the Maine Department of Economic and Community Development

("Maine DECD").  Defendant Johnson is being sued in her official capacity, and also in her personal capacity.

## V.  STATEMENT OF FACTS[5]

**A.   Chronology**

**2003**

- CDC publishes Medical Examiners' and Coroners' Handbook on Death Registrations[6] and Fetal Death Reporting and Physicians' Handbook on Medical Certification of Death. Publications set nationwide standard for collection and reporting of "cause of death" information on death certificates.  2003 guidance is followed today for all diseases, *with the sole exception* of deaths in which COVID-19 is suspected or confirmed.  When COVID-19 is suspected or confirmed, the CDC's March 24, 2020 COVID-19 Alert No. 2 is followed instead.

**2020**

- 1/21: Publication of the Corman-Drosten Paper "Detection of 2019 novel coronavirus (2019-nCoV) by real-time RT-PCR" in which researchers claim to have validated the use of PCR testing for SARS-CoV-2 virus.

- 1/21:  CDC confirms first known case of COVID-19 in U.S.

- 2/11:   WHO reports on its website: "Most people infected with the COVID-19 virus will experience mild to moderate respiratory illness and recover without requiring special treatment.  Older people, and those with underlying medical problems like cardiovascular disease, diabetes, chronic respiratory disease, and cancer are more likely to develop serious illness."

- 2/27:   U.S. Surgeon General Adams states: "Seriously people- STOP BUYING MASKS! They are NOT effective in preventing general public from catching #Coronavirus, but if healthcare providers can't get them to care for sick patients, it puts them and our communities at risk!"

---

[5] This case intersects science, medicine and associated statistics.  In the interest of an efficient presentation, Plaintiffs have not footnoted or annotated their numerous scientific, medical and statistical references.   Plaintiffs can provide the Court with footnotes and annotations upon request.   Plaintiffs have conducted a thorough investigation, and will present the Court with substantial documentary and live expert testimony at trial.

[6] *See* https://www.cdc.gov/nchs/data/misc/hb_me.pdf (last visited February 3, 2021).

- 3/9: CDC alerts American citizens over the age of 60 and with pre-existing conditions that they are likely at higher risk of fatality if COVID-19 is contracted.

- 3/9: Maine CDC issues Health Advisory "Preparing for Community Transmission of COVID-19 in Maine." The advisory raises the frightening prospect of COVID-19 overwhelming Maine's medical infrastructure, as a result of widespread community transmission. "Such [widespread community] transmission could mean large numbers of patients needing medical care at the same time, stressing health care providers and hospitals/other health care facilities."

- 3/12: Maine CDC issues Health Advisory "First Presumptive COVID-19 Case in Maine."

- 3/15: Governor Mills issues a Proclamation initiating the Emergency, and activating her emergency powers.

- 3/15: Maine CDC issues Health Advisory "Actions to Take Now for Community Transmission of COVID-19." The Advisory states: "Such [community transmission] will likely mean large numbers of patients needing medical care at the same time, stressing health care providers, hospitals, and other health care facilities. Critical systems, including emergency medical services, are likely to be affected…"

- 3/17: Maine State Legislature adjourns. It is supposed to be in session until at least June 16, 2020. It does not end its adjournment by re-convening until March 10, 2021.

- 3/18: Executive Order (E.O.) 14 FY 19/20 bans all gatherings of more than 10 people, including religious services, and forces all restaurants and bars to close their dine-in facilities.

- 3/24: CDC and NVSS issue "COVID-19 Alert No. 2." Alert releases a "newly-introduced ICD code" (U07.1) to "accurately capture mortality data for Coronavirus Disease 2019 (COVID-19) on death certificates." The rule establishes a unique system for collecting and reporting "cause of death" information on individuals who die while purportedly infected with COVID-19. Collecting and reporting "cause of death" information on individuals who die with any other infectious disease continues to be handled under the old rules. The Alert states "COVID-19 should be reported on the death certificate for all decedents where the disease caused *or is assumed to have caused or contributed* to death" (emphasis added).

- 3/24:  E.O. 19 FY 19/20 forces all "non-essential" businesses to close "in order to save lives and improve the ability of the health care system to respond."

- 3/26:  Dr. Neil Ferguson, Imperial College London, publishes COVID-19 predictive model incorrectly asserting 2.2 million Americans will die. Model not peer reviewed. Shared with policymakers prior to publication.

- 3/30:  U.S. Surgeon General Adams states that data does not support healthy people wearing masks in public.

- 3/31:  E.O. 28 FY 19/20 confines all Maine residents to their homes with limited exceptions, imposes a 6-foot social distancing requirement both outdoors and indoors when not at home, closes all private and public schools for in-person instruction until at least May 1, 2020.

- 4/3:  E.O. 34 FY 19/20 requires all people (resident and non-resident) traveling into Maine to quarantine for 14 days, except when engaging in essential services; closes all lodging operations as "non-essential," and prohibits them from accepting online reservations.

- 4/14:  CDC adopts the CSTE COVID-19 Position Paper, significantly altering established medical criteria for diagnosis, exclusively for COVID-19; allows for probable diagnoses unconfirmed by lab testing.

- 4/14:  Governor Mills issues a Proclamation extending the Emergency and her emergency powers.

- 4/22: Maine CDC issues Health Advisory "Temporary Updates to the Notifiable Diseases and Conditions List – SARS CoV-2 and COVID-19 Deaths."  It states: "A COVID-19-associated death is defined as a death resulting from an illness that is clinically compatible with COVID-19 that is confirmed by an appropriate laboratory test. …It is not necessary that COVID-19 be the primary cause of death."

- 4/29:  E.O. 49 FY 19/20 requires everyone to wear a face mask covering both nose and mouth in indoor and outdoor public settings where physical distancing is difficult to maintain.  The Order includes exceptions for children under 2, children in childcare settings, those who cannot wear a mask because of a medical condition and those unable to remove the mask without assistance.  The Order extends the prior home confinement order, with a few additional exceptions to allow access to barber shops, hair salons, auto dealerships and "drive-in stay-in-your-vehicle" religious services.

- 5/13:  Governor Mills issues a Proclamation extending the Emergency and her emergency powers.

- 5/14:  Governor Mills announces lodging providers can begin accepting reservations for stays commencing on or after June 1, 2020, however, non-residents who comply with the quarantine requirement must be prepared not to travel, and lodging operators must be prepared to refund reservations, if the Governor does not allow lodging providers to open in June as planned.

- 5/29:  E.O. 55 FY 19/20 authorizes businesses to deny entry or service to persons not wearing face coverings.  The Order also bans all indoor gatherings, including religious services, exceeding 50 persons. The Order continues the prior home confinement order but increases the number of permitted reasons for leaving the home.

- 6/9:  E.O. 57 FY 19/20 requires all people (both residents and non-residents) traveling into Maine to receive a negative COVID-19 test, or quarantine for 14 days upon arrival in Maine.  Travelers must complete a certificate of compliance and present to lodging operators as a condition to check-in.  The Order announces a preference for COVID-19 testing.

- 6/10:  Governor Mills issues a further Proclamation extending the Emergency and her emergency powers.

- 7/8:  Governor Mills issues a further Proclamation extending the Emergency and her emergency powers.

- 7/8: E.O. 2 FY 20/21 toughens the face mask requirement by forcing large retail stores, restaurants, bars and lodging operations to "implement measures requiring customers to wear face coverings.  Such measures may, for example, include denial of entry or service."

- 8/1:  E.O. 6 FY 20/21 repeals face mask exceptions for children under 2 and in child-care setting. The Order recommends face masks for children aged 2 to 4 unless developmentally inappropriate, and requires them for children aged 5 and older in public settings.

- 8/5:  Governor Mills issues a further Proclamation extending the Emergency and her emergency powers.

- 8/21:  The World Health Organization ("WHO") publishes "Coronavirus Disease (COVID-19): Children and masks."  The guidance states that "[c]hildren aged 5 years and under should not be required to wear masks." The decision whether children aged 6 to 11 should wear masks should be based on the specific circumstances of each child taking into account 6

24

different factors.  Further, "[t]he use of masks for children of any age with developmental developmental disorders, disabilities or other specific heath conditions should not be mandatory…"

- 9/2:   Governor Mills issues a further Proclamation extending the Emergency and her emergency powers.

- 9/8: Maine CDC issues Health Advisory "COVID-19 Testing Updates – September 2020."  The Advisory states that "[p]ersons who test positive for SARS-CoV-2, the virus that causes COVID-19, using a molecular amplification test and have not had a previous positive test, should be considered infected at the time of testing, regardless of any subsequent negative testing results."

- 9/13:   Governor Mills issues a further Proclamation extending the Emergency and her emergency powers.

- 10/6: E.O. 14 FY 20/21 bans all indoor gatherings in facilities where seating is provided (including *inter alia* houses of worship), exceeding 50% of permitted occupancy or 100 persons, whichever is less.  The Order recommends face coverings for children aged 2 to 4 unless developmentally inappropriate in school and childcare settings, and forces all children aged 5 and older to wear masks in those settings. The Order does not require face masks for those under 2, with trouble breathing or related medical conditions, who cannot put on or remove the mask without assistance, or who has a developmental issue complicated or irritated by a face covering.

- 10/29:   Governor Mills issues a further Proclamation extending the Emergency and her emergency powers.

- 11/4:  E.O. 16 FY 20/21 requires all people to wear face masks in all indoor and outdoor public settings even if social distancing is possible, and expands definition of term "public setting."   The Order also once again bans all indoor gatherings exceeding 50 people.

- 11/24:   Governor Mills issues a further Proclamation extending the Emergency and her emergency powers.

- 11/27:  Consortium of 22 independent scientists publishes external peer review of the Corman-Drosten Paper, identifying 10 fatal technical and scientific flaws, calling for the Paper's retraction, and concluding that the Corman-Drosten protocol that is the basis of PCR testing worldwide has led to "worldwide misdiagnosis of infections attributed to SARS-CoV-2." The peer review concludes that PCR test data from a cycle value of 35 or more is "completely unreliable" and detects only non-infectious (dead)

virus.  Less than 3% of samples producing positive PCR test results at this level of amplification, when cultured, produce positive cultures. In other words, **97% of positive PCR tests run at an amplification cycle of 35 or more are false positives.** PCR test data from a cycle value of 30 or more is a "grey area" and a positive result cannot be trusted.

- 12/1: CDC guidance continues to sanction PCR testing at up to 40 cycles of amplification.

- 12/11:  The U.S. Food and Drug Administration ("FDA") issues the first Emergency Use Authorization ("EUA") for the Pfizer-BioNTech COVID-19 Vaccine, allowing its distribution and use in the United States.

- 12/11:  E.O. 19 FY 20/21 clarifies that while accommodations may be made for persons with disabilities, "no such accommodation may make it permissible for any person to enter into or remain in any indoor pubic setting without a face covering."

- 12/14: WHO issues an Information Notice warning of false positive COVID-19 tests resulting from PCR tests run at high levels of amplification.  The Notice cautions: "Users of RT-PCR reagents should read the IFU carefully to determine if manual adjustment of the PCR positivity threshold is necessary to account for any background noise which *may lead to a specimen with a high cycle threshold (Ct) value result being interpreted as a positive result*. . .. [W]hen specimens return a high Ct value, it means that many cycles were required to detect virus. In some circumstances, *the distinction between background noise and actual presence of the target virus is difficult to ascertain*" (emphasis added).

- 12/15:  E.O. 19-A FY 20/21 removes face mask exceptions for those with trouble breathing or a related medical condition, or who is otherwise unable to put on or remove a face mask without assistance, or who have a developmental issue complicated by the face mask.

- 12/18:  FDA issues its second EUA for the Moderna COVID-19 Vaccine, allowing its distribution and use in the United States.

- 12/22:   Governor Mills issues a further Proclamation extending the Emergency and her emergency powers.

**2021**

- 1/19:   Governor Mills issues a further Proclamation extending the Emergency and her emergency powers.

- 1/20: WHO issues a further Information Notice regarding the protocol for COVID-19 tests.  The Notice is expected to result in large reductions in the numbers of positive cases.  The Notice calls for the "careful interpretation of weak positive results," reminds clinicians that "[t]he cycle threshold (Ct) needed to detect virus is inversely proportional to the patient's viral load" and calls for the number of cycles used to detect the presence of the virus to be reported along with the test result.

- 1/27:  Maine CDC issues Health Advisory stating *inter alia* that "[a]ll individuals should continue to wear face coverings and adhere to physical distancing guidelines regardless of whether they have recovered from COVID-19 infection or received vaccine."

- 2/12:  .O. 31 FY 20/21 revises indoor gathering limits by banning all gatherings in houses of worship exceeding 5 persons per 1,000 square feet of functionally available space, or 50 persons, whichever is greater.

- 2/27:  FDA issues its third EUA for the Janssen / Johnson & Johnson COVID-19 vaccine, allowing its distribution and use in the United States.

- 3/5:  E.O. 35 FY 20/21 revises the indoor gathering limits effective March 26, by banning all indoor gatherings exceeding 50% of permitted occupancy, 5 persons per 1,000 sq. ft., or 50 persons, whichever is greatest; and further effective May 24 by banning all indoor gatherings exceeding 75% of permitted occupancy, 5 persons per 1,000 sq. ft., or 50 persons, whichever is greatest.  The Order also exempts those who have been fully vaccinated and those who have contracted COVID-19 and completed their isolation from the testing and quarantine requirements applicable to travelers.

**B.**     **There is No Emergency - Even Assuming the Accuracy of COVID-19 "Death" and "Case" Counts**

   **(1)     Reported COVID-19 Deaths Fall Far Below the Deaths Projected a Year Ago**

52.     The trajectory of the governmental response to COVID-19 was tragically influenced by a seriously flawed model developed by Neil Ferguson of the Imperial College of London, which predicted 2.2 million deaths from COVID-19 in the United States (there have been 504,803 according to the CDC), and tens of millions of deaths worldwide (there have been 2,604,373, according to Johns Hopkins University).  The

model was cited by the WHO.  The report compared COVID-19 to the Spanish flu, which killed approximately 50 million people in 1918.  Ferguson's report stated that the only way to prevent massive deaths would be for the entire population of the planet to be locked down and for people to remain separated for 18 months until a vaccine was available. On the basis of Ferguson's report, the World Health Organization, which had previously stated that lockdowns were not effective for containing infectious diseases, recommended that the world follow China's example, which included mandatory lockdowns and contact tracing.

53.     That Ferguson's projections could be so flawed is not surprising, given his past work.  In 2002, he predicted that 150,000 people would die from Mad Cow Disease, but only 2,704 died – an estimation 55 times higher than the real number.  A few years later he predicted that 65,000 people would die of swine flu, and only 457 people died – an estimation that was 142 times higher than the real number.  He predicted 200,000,000 deaths from bird flu, and only 455 people died – a prediction 439,560 times higher than the real number.

54.     Tom Frieden, the Director of the CDC under President Obama, was more conservative, but still wrong, when estimating in early March of this year that a figure of 1,000,000 U.S. deaths was plausible.  The media jumped on the bandwagon of dire predictions and spread fear throughout the population. These predictions initially influenced public policy to a considerable degree in the United States, including here at home in Maine, but we now know that they were wrong.

55.     The Maine CDC reports that COVID-19 has killed 723 Maine residents, representing 0.05% of the State's population. This figure alone establishes that there is no justification for the Emergency and the Emergency Mandates.

### (2)     COVID-19 Does Not Threaten the Entire Population - Fatalities Are Limited to a Definable Age Demographic

56.     *From the very beginning*, it has been clear that COVID-19 affects the elderly disproportionately, subjecting them to the highest risks of infection if exposed, hospitalization and death.   A March 30, 2020 study published in the respected U.K. medical journal the Lancet showed a dramatic difference in case fatality rates by age group, estimating a 0.63% average rate for all those under 60 years old, and a 6% average rate for those over 60 years old.   Data from China, Europe and the WHO released even earlier in 2020 pointed to the same conclusion.

57.     In fact, in Maine, fully 85% of all deaths attributed to COVID-19 have occurred in the 70 and over age group.   More than 80% of the State's population is *not* included in that demographic.   No people under the age of 20 have died of COVID-19 in Maine.   At least 83% of Mainers who are 80 or over and who are included in the Maine CDC COVID-19 case count, have survived it.   At least 94% of Mainers who are 70 or over and who are included in the Maine CDC COVID-19 case count, have survived it.

58.     Based on this data, the Defendants could have crafted far less burdensome mandates designed specifically to protect this most vulnerable age demographic, rather than attempting to protect 100% of the population.   Data available in early March 2020 could have been used by State decision-makers to support a narrowly tailored strategy of containment for the segment of the population most at risk, without causing profound

disruptions to the entire economy and all of Maine's residents regardless of their risk profile.

59.     The irrationality of the State's response is nowhere more evident than in its approach to the elderly in the State's nursing homes.  3 months into the Emergency, Maine CDC had sent inspectors to less than one-third of the State's nursing homes.  By mid-June 2020, nursing home residents accounted for more than 50% of all COVID-19 deaths in Maine.  Federal inspection data at that time reveals that Maine was inspecting nursing homes at a slower rate than all but 9 other states.  Further, Maine CDC failed to prioritize testing at nursing homes and congregate care facilities, even denying testing analysis to those facilities who were requesting it in order to stay ahead of potentially deadly outbreaks.

60.     Instead of narrowly tailoring their interventions, the State's officials deployed countermeasures applicable to the entire population, including extreme lockdown policies, massive governmental intrusions into our daily lives, and maximal invasions of our constitutional freedoms.

### (3)    COVID-19 Kills Fewer People than other Causes of Death, for Which No Emergency Has Been or Will Be Declared

61.     According to the Maine CDC, Maine experienced the following non-COVID-19 deaths in 2019, all without any proclamation of a state emergency:

**Deaths by Cause in Maine, 2019**

| Cause of Death | Number of Deaths | As Percentage of Maine Population |
| --- | --- | --- |
| Cancer | 3,415 | 0.25% |
| Heart Disease | 2,939 | 0.22% |
| Accidents | 1,025 | 0.08% |
| Chronic Lower Respiratory Disease | 1,017 | 0.08% |

| COVID-19 | 723 | 0.05% |
|----------|-----|-------|

62.     The federal CDC reports that nationwide there have been 503,052 COVID-19 deaths, representing 0.15% of the population.  Even if we were to assume *arguendo* that Maine's COVID-19 death per population rate will increase to the national level, it remains less than other leading causes of death in the State for which no emergency has been (or will be) declared.

**(4)     COVID-19 Has Not Overwhelmed Healthcare Capacity**

63.     In March and April of 2020, the Defendants told us that our constitutional freedoms had to be taken away from us so that we could "flatten the curve" of COVID-19 cases.  This was a reference to a federal CDC model that predicted a tremendous surge in the need for hospitalization around the country due to COVID-19 that would overrun our healthcare infrastructure.  That model, like so many others that were the basis for public health policy nationally and in the State, was wildly exaggerated.  The federal government spent at least $660 million constructing field hospitals around the country, but most of them never treated a single patient and were dismantled.  Maine CDC data indicates that while the State has a total of 319 ventilators and 446 "alternate ventilators," no more than 37 people were on them at any given time.  Thus at peak, only 11.6% of the State's ventilator capacity was used, and only 4.8% of the combined ventilator and "alternate ventilator" capacity was used.  The data also indicates that while the State has a total of 387 critical care beds, no more than 71 were used at any given time, representing only 18.4% of total capacity.

**(5)     Multiple COVID-19 Vaccines are Now Deployed**

64.     The FDA has issued Emergency Use Authorizations for COVID-19 vaccines produced by three different manufacturers – Janssen, Moderna and Pfizer-BioNTech, and they are circulating in the population. Federal CDC data indicates that since vaccine distribution began in the United States on December 14, 2020, more than 90 million doses have been administered to 17.7% of the population.  Maine CDC data indicates that 20.43% of the State's population has received a first dose of vaccine, and that 11.62% has received a final dose.  As of February 2021, over half of the most vulnerable Mainers – those 70 and older - have already been vaccinated.

### (6)     The Population Has Reached or Is Fast Approaching Herd Immunity

65.     Dr. Marty Makary, a Professor from Johns Hopkins' Bloomberg School of Public Health, has projected that stated that COVID-19 will disappear in the United States by April 20201 due to herd immunity, which he says is the "inevitable result of viral spread and vaccination."  COVID-19 "cases" are down 77% over the past 6 weeks nationally, which he attributes to "natural immunity from prior infection." He explains: "Testing has been capturing only from 10% to 25% of infections, depending on when during the pandemic someone got the virus. Applying a time-weighted case capture average of 1 in 6.5 to the cumulative 28 million confirmed cases would mean about 55% of Americans have natural immunity."  Another 18% of the population has been vaccinated.  If 73% of Americans are already immune, why is Maine still suffering in the legal construct of this Emergency?

### C.     There is No Emergency - the COVID-19 "Death" and "Case" Counts are Inflated

66.     The preceding section of this Complaint assumes the accuracy of the COVID-19 "death" and "case" data upon which the Defendants have based their Emergency Mandates. In this section, Plaintiffs challenge the data's accuracy.

### (1)     NVSS Coding Instructions Unique to Death Certificates for Individuals Testing Positive for COVID-19 Result in Over-Reporting of Deaths Caused by COVID-19

67.     For the past 17 years, all infectious diseases and causes of death have been categorized based on the federal CDC's Medical Examiners' & Coroners' Handbook on Death Registration and Fetal Death Reporting and the federal CDC's Physicians' Handbook on Medical Certification of Death.   These documents instruct coroners and physicians to differentiate between (i) immediate cause of death, (ii) underlying cause of death, and (iii) any other illness, condition, or injury that contributed to but did not cause the underlying cause of death.   The Coroners' Handbook states:

> For statistical and research purposes, it is important that the causes of death and, in particular, the underlying cause of death, be reported as specifically and as precisely as possible. Careful reporting results in statistics for both underlying and multiple causes of death (i.e., all conditions mentioned on a death certificate) reflecting the best medical opinion.

68.     On March 24, 2020 the National Vital Statistics System ("NVSS") introduced a new International Classification of Disease ("ICD") code for Coronavirus Disease 2019 (U07.1) to "accurately capture mortality data for Coronavirus Disease 2019 (COVID-19) on death certificates."   Instead of differentiating between primary and underlying causes of death, the new coding instruction lumps the two together, and instructs coroners and physicians to report as COVID-19 deaths any death where the disease caused "*or is assumed to have caused or contributed to death*" (emphasis added).

69.     This is not an academic concern.  The federal CDC's own data regarding co-morbidities shows that "[f]or 6% of [COVID-19] deaths, COVID-19 was the only cause mentioned.  For [COVID-19] deaths with conditions or causes other than COVID-19, on average, there were 2.6 additional conditions or causes of death."    Public health officials across the United States have stated that they consider anyone who died with a positive PCR test to have died from COVID-19, and are counting accordingly.  If 6% of the COVID-19 deaths reported by the Maine CDC is a more accurate count, then the true number of COVID-19 deaths in Maine as of this writing is 43, or only .003% of the State's population.  The Maine CDC admits that under its death count rules "***[i]t is not necessary that COVID-19 be the primary cause of death***" (emphasis added).

70.     Dr. Genevieve Briand of John Hopkins University published a study demonstrating that the overall death rate in the United States has remained the same, despite the deaths attributed to COVID-19.  Dr. Briand analyzed federal CDC data for 2018 and 2020, and found that nationwide deaths from causes other than COVID-19, decreased by the same amount that COVID-19 deaths increased.  There are no excess deaths due to COVID-19.

### (2)     The PCR Test for COVID-19 is Seriously Flawed and Results in False Positive Results at High Cycles

71.     Maine CDC data shows that of all forms of testing for infection with the SARS-Cov-2 virus, the laboratory PCR test dominates in Maine.  78% of all testing in Maine is PCR testing.

72.     The PCR test works as follows. The test requires a sample of mucus from a person's nose or throat or sputum (and more recently, PCR tests using saliva have been introduced), then uses that sample to search for viral RNA, which is a fragment of genetic

material belonging to a virus.   RNA is then converted to DNA through a process called reverse transcription, which is then amplified many times to make it detectable, through a process called polymerase chain reaction, or PCR.  The PCR process of amplification involves creating copies of the viral DNA and is done in cycles, and cycles can be repeated until there are as many as one billion copies of the original viral fragment.  The number of times a cycle is repeated is called the "Ct value."  In most of the United States' lab settings, the cycle is repeated at least 35-40 times before a specimen is declared "negative," or devoid of viral material, although the WHO initially established a standard cycle threshold limit of 45 cycles.

73.     Hundreds of companies are currently producing PCR tests for detecting viral RNA claimed to be from SARS-CoV-2.  These tests were approved by the FDA under Emergency Use Authorization (EUA) without an established reference method, but rather testing the tests against other EUA approved tests to establish an acceptable degree of performance. This process involved testing specimens from people who the researchers already knew had COVID-19. This results in significant bias.  Without control groups of blinded testing, it is impossible to determine the magnitude of the inaccuracy of a given test.

74.     There are other issues with the PCR tests. One is that the viral RNA detected by the test is likely to remain in a person for up to 3 months after the infectious period has passed.  This means the tests are useless for determining who should be quarantined as they do not differentiate between active virus vs. inactive or dead virus from a previous infection or exposure that was effectively controlled by the body's immune system. Another is the risk of cross-contamination, of collected specimens or

reagents (chemical components of the test), from improper handling, in the laboratory or when collecting specimens from large numbers of people in crowded settings.   Even the tiniest amount of cross-contamination can lead to a false positive result, which means people who have never been exposed to COVID-19 could be subjected to unwarranted quarantines.

75.     Aside from the issue of accuracy, there is the issue of suitability of the PCR test as a diagnostic tool. The inventor of the PCR test, Kary Mullis, Ph.D., who won a Nobel Prize in chemistry for the invention in 1993, developed the test as a tool for use in laboratory research, but said that the test was never designed to diagnose disease. That is because, while COVID-19 PCR tests identify the presence of viral fragments in DNA, the tests do not provide accurate information about the presence of infectious, live virus as opposed to non-infectious (dead) viral fragments.  The federal CDC apparently agrees.  The July 2020 instruction manual for its 2019-Novel Coronavirus (2019-nCoV) Real Time RT-PCR Diagnostic Panel test includes these statements: "***Detection of viral RNA may not indicate the presence of infectious virus or that 2019-nCoV is the causative agent for clinical symptoms***" (emphasis added); and "This test cannot rule out diseases caused by other bacterial or viral pathogens."

76.     In addition, it appears that PCR test development took place in the absence of an isolated SARS-CoV-2 virus, the virus alleged to cause COVID-19.  From the final paragraph of the foregoing instruction manual:

> Since no quantified virus isolates of the 2019-nCoV are currently available, assays designed for detection of the 2019-nCoV RNA were tested with characterized stocks of in vitro transcribed full length RNA (N gene; GenBank accession: MN908947.2) of known titer (RNA copies/µL) spiked into a diluent consisting of a suspension of human A549 cells and viral transport medium (VTM) to mimic clinical specimen.

77.     In January 2020, a group of scientists authored the Corman-Drosten Paper, in which they claimed to have validated the use of PCR testing for the SARS-CoV-2 virus.  This Paper was relied upon worldwide to promote the use of PCR testing.  And yet it discloses: "We aimed to *develop* and deploy robust diagnostic methodology for use in public health laboratory settings without having virus material available."  The scientists claimed to have established a methodology for using the PCR test to identify the SARS-CoV-2 virus using "theoretical genetic sequences" of a "closely related" virus.

78.     In November 2020, an international consortium of scientists conducted an external peer review of the Corman-Drosten Paper, identified 10 fatal defects in the Paper, and called for its retraction. Obviously, the most serious of the flaws was the fact that it is impossible to develop a valid test without actual viral material, and the use of viral material referred to as "closely related" is not a proper substitute. "Theoretical genetic sequencing" means bits of genetic material fed into a computer to guess at the remaining sequence. In other words, it is made up.  In plain English, it would appear that there were no available pure SARS-CoV-2 isolates to test against, so instead an educated best guess was used. How accurate can a test for a virus causing COVID-19 be, when that virus has not been isolated?  Also, as stated elsewhere, it was determined that the test could not distinguish between whole live virus and dead viral fragments.  The federal CDC has admitted that "[r]ecovered adults can continue to shed detectable but non-infectious SARS-CoV-2 RNA in upper respiratory specimens for up to 3 months after illness onset."  Further, the Corman-Drosten scientists failed to establish a "Ct value" at which a sample is considered positive and negative.

79.     There is yet another problem with the use of the PCR test as a diagnostic test.  PCR tests have been shown to produce a highly elevated rate of "false positive" results in people who are likely not infectious, especially in asymptomatic (healthy) people.  This is a by-product of the PCR process, in which a viral genetic fragment is amplified in cycles.  Each amplification cycle is a doubling, so it is exponential. This means that an amplification factor of 40 is 1 x 2 to the 40th power, or more than a trillion times amplification.  As explained in a review of PCR tests, published by the *Society of Critical Care Medicine*:

> Through the use of fluorescent probes and detection steps between replication cycles, the test allows quantification of the amount of viral RNA (viral load) in a sample. As DNA is replicated exponentially during PCR, the fluorescence also increases exponentially. The [testing] instrument reports a Ct (cycle threshold), which is the number of replication cycles that are required to produce a fluorescent signal that exceeds a baseline. Samples that contain a large starting amount of viral RNA require fewer cycles to produce a detectable fluorescent signal (and therefore have a lower Ct). The Ct has a simple negative linear correlation with the logarithm of the number of viral copies in the original sample. This relationship quantifies the amount of viral RNA in a specimen; however, the assays [tests] must then include additional standards containing known concentrations of viral RNA.

80.     There are three important things to note in this description. One is reference to a "baseline," a point at which viral RNA presence is deemed significant, which is determined by each test manufacturer, not a standard established by a centralized public health authority like the FDA.  Another is that in order to quantify the amount of virus in a specimen, the test must compare the resultant "Ct value" to "some known concentration of RNA." It is not known if the tests do this but our research has indicates that the test result is simply a binary.

81.     The third important point is that "the Ct has a simple negative linear correlation with the logarithm of the number of viral copies in the original sample."  The

number of cycles at which viral fragment is detected varies with the viral load, or the amount of virus, that an individual is carrying.  So individuals who "test positive" at a higher cycle threshold have a lighter viral load, and are therefore not likely to be infectious.  Current practice is to report test results as binary results, "positive" or "negative," with no reference to "Ct value," and therefore with no consideration of how much of a viral load a person may carry or how infectious they may or may not be, grossly inflating the number of people who pose a risk to others.  Also, without any standardized guidance from the FDA, the number of cycles at which a test result is deemed "positive" or "negative" varies from lab to lab, test to test.  As a result, healthy people who are not infectious are being unnecessarily subjected to self-isolation, quarantine, and/or contract tracing, and their places of employment can be shut down.

82.    In September 2020, the *Journal of Clinical Infectious Diseases* published scientific research supported by a grant from the French government, in which scientists performed 250,566 COVID-19 PCR tests on 179,151 patients and found that 13,161 were positive. They selected 3,790 "positive" samples and attempted to grow a virus in a culture medium.  They were only successful in growing a virus in about half of the samples.  For those samples, in which the "Ct value" was 25 cycles for a positive test, 70% grew a virus.  But when the "Ct value" was 35 cycles, only 3% of the samples grew a virus.  This is important since many of the PCR tests granted Emergency Use Authorization by the FDA use a "Ct value" of 35-45 cycles or higher when testing for COVID-19, and at these cycles we can expect a false-positive rate as high as 97% based on the French study.  The study concludes that positive test results at Ct values over 30 should not be used to guide public health decisions.  Many other experts agree with this.

39

Even Dr. Fauci is aware that PCR is useless and unreliable for diagnosing COVID-19 when run at 35 cycles or higher:

> What is now evolving into a bit of a standard is that if you get a cycle threshold of 35 or more that the chances of it being replication competent are miniscule…We have patients, and it is very frustrating for the patients as well as for the physicians…somebody comes in and they repeat their PCR and it's like 37 cycle threshold…you can almost never culture virus from a 37 threshold cycle. So I think if somebody does come in with 37, 38, even 36, you gotta say, you know, it's dead nucleotides, period." In other words, it is not a COVID-19 infection.

83.    The chart below sets forth the manufacturer's recommended cycle threshold for 5 commonly used PCR tests:

| Manufacturer | Manufacturer's Recommended Cycle Threshold |
|---|---|
| CDC 2019-Novel Coronavirus Real Time (RT-PCR Diagnostic Panel) | 40 cycles |
| SARS-CoV-2 Test Kit (Real-time PCR) | 45 cycles |
| **Opti Sars CoV-2 RT-PCR Test** | **45 cycles** |
| Wren Labs COVID-19 PCR Test | 38 cycles |
| LabCorp COVID-19 RT-PCR | 35 cycles |

Maine CDC relies heavily, if not exclusively, on the Opti Sars CoV-2 RT-PCR Test, for which the manufacturer recommends a threshold of 45 cycles.  Scientific studies and statements of the WHO indicate that PCR tests run at this high threshold level are perfectly useless for the purpose of diagnosing COVID-19.

84.    Finally, it is worth noting that these test manufacturers will continue selling tests only as long as the "crisis" continues.  Once it ends, sales and profits drop. They are incentivized to find cases and do not even have to report how they determine a case exists, in that they do not have to report "Ct values."  Dr. Facuci has stated that when someone has a positive test, "…they don't give them the cycle threshold unless they go back and ask for it."

85.     The WHO has issued two Information Notices cautioning public health officials about the risk of false positive results when PCR tests are run at high cycles.  In December 2020, it issued a notice stating:

> Users of RT-PCR reagents should read the IFU carefully to determine if manual adjustment of the PCR positivity threshold is necessary to account for any background noise which *may lead to a specimen with a high cycle threshold (Ct) value result being interpreted as a positive result*. . .. [W]hen specimens return a high Ct value, it means that many cycles were required to detect virus. In some circumstances, *the distinction between background noise and actual presence of the target virus is difficult to ascertain* (emphasis added).

In January 2021, it issued a further notice counseling the "careful interpretation of weak positive results," reminding clinicians that "[t]he cycle threshold (Ct) needed to detect virus is inversely proportional to the patient's viral load" and calling for the number of cycles used to detect the presence of the virus to be reported along with the test result.

86.     If the PCR test error rate were only 5%, that would mean that the number of cases worldwide is off by millions.   But the error rate has been shown to be much higher, which means the world's population is suffering under unprecedented lockdowns due to a made-up pandemic.

### (3)     Maine CDC's "Case" Count is Inflated by Inclusion of "Probable Cases" and "Cases" of Persons Who do not Live in Maine

87.     On April 25, 2020, Maine CDC announced that it would include "probable cases" in its case count.  It defines a "probable case" so broadly, that any number of different ailments could be included.  An individual who has any one of the following symptoms will be reported as a probable case: cough, shortness of breath, difficulty breathing, or new loss of taste or smell.  An individual who has at least 2 of the following symptoms will be reported to the public will be reported as a probable case:  fever, chills,

repeated shaking with chills, muscle pain, headache, sore throat, nausea, vomiting, diarrhea, fatigue, congestion or runny nose.

88.     Defendant Dr. Shah has described a typical "probable case" as follows:

> The doctor may decide not to test the person because of the timeline they developed the symptoms are classic for COVID 19, their doctor may say, you're feeling okay just stay home, don't bother coming in, the doctor would then notify Maine CDC that they've got a probable case. No lab test, but in this case, looks like a case, behaves like a case, it's got all the symptoms of a case, we label it as a case even if they don't have a lab test.

Maine CDC data indicates that probable cases comprise at least 22% of the COVID-19 case count.

89.     Unbelievably, according to the Maine CDC, its case count also includes data regarding individuals who do not actually live in Maine: "Data are about individuals who claim residency in Maine regardless of what state they were tested in, or where they are currently living. For example, an individual who claims residency in Maine but lives in Florida will appear in this data even if they were living in Florida at the time of illness."

### (4)     The "Case" Count is Subject to Perverse Financial Incentives

90.     As previously noted, manufacturers of the PCR test benefit if the "crisis" continues, and the crisis continues if the State uses PCR tests employing cycles above 30 to determine "cases."

91.     It is also critical to note the financial incentive to include deaths as COVID-19 deaths.  In Maine, according to Becker's Hospital Review, hospitals are being reimbursed an additional $200,000 per COVID-19 case, and a death from COVID-19 can qualify as a "case" without a lab test.  COVID coding on  a death certificate is evidence of a probable case and can result in an additional 20% hospital reimbursement from

Medicare under provisions of the federal CARES legislation.  CDC Director Robert Redfield acknowledged this perverse financial incentive in sworn Congressional testimony on COVID-19: "I think you're correct in that we've seen this in other disease processes too, really in the HIV epidemic, somebody may have a heart attack, but also have HIV – the hospital would prefer the classification for HIV because there's greater reimbursement."

92.    The number reported as "total cases" is extremely misleading for most people who assume that this figure reflects the actual number of persons who are *currently* "infected" and therefore "infectious", or who, by symptoms, have been diagnosed as having COVID-19.  The public has been brainwashed to believe that a "case" is an infectious person walking among the public, a dangerous "silent spreader" of a virus. The public is being misled by the fear-inducing, ever-increasing, cumulative case count that is constantly and verbally projected at them, believing that these numbers demonstrate a serious state of emergency. It is no wonder that so many people are living in extreme panic and hysteria over this disease.

93.    In sum, these "case" and "death" counts, based on uniquely relaxed rules for death certificate reporting, faulty PCR testing, "probable case" counts and the infections of those who do not even live in Maine, are inflated and completely unreliable. They are subject to perverse financial incentives.  They are broadcast to the public, and used to justify and fashion Emergency Mandates.  Those Emergency Mandates have robbed the people of the State of their precious freedoms, and they are enforceable with criminal prosecution, imprisonment and fines.   Where is the limit of judicial deference, in these circumstances?

### D. The Defendants' COVID-19 Mandates Are Ineffectual, and Unsupported by Science or Medicine

#### (1) The Fallacy of Asymptomatic Spread

94.     The designation of healthy people as a "case" which represents an "infection" is part of the "asymptomatic spread" argument, which the state uses to justify isolating everyone, throwing them out of work, closing businesses, and destroying the learning and social lives of children in the name of public safety.  But there is *no credible scientific evidence* that demonstrates that the phenomenon of "asymptomatic spread" is real.   To the contrary, on June 7, 2020, Dr. Maria Von Kerkhov, head of the WHO's Emerging Diseases and Zoonosis Unit, told a press conference that from the known research, asymptomatic spread was "very rare."  "From the date we have, it still seems to be rare that an asyptomatic person actually transmits onward to a secondary individual."  She added for emphasis: "it's very rare."   Researchers from Southern Medical University in Guangzhou, China, published a study in August 2020 concluding that asymptomatic transmission of COVID-19 is *almost non-existent*.  "Asymptomatic cases were least likely to infect their close contacts," the researchers found. A more recent study involving nearly 10 million residents of Wuhan, China found that there were no, zero, positive COVID-19 tests amongst 1,174 *close contacts* of asymptomatic cases, *indicating the complete absence of asymptomatic transmission*.

#### (2) The Futility of Masking

95.     The Emergency Mandates require all persons, even those as young as 2, and even those with disabilities, to wear masks in any outdoor or indoor pubic setting, or while using public transportation.  This draconian age limit contradicts WHO guidance that "[c]hildren 5 years and younger should not be required to wear masks.  This is based

on the safety and overall interest of the child and the capacity to appropriately use a mask with minimal assistance. …the decision to use masks for children aged 6-11 should be based on …[p]otential impact of wearing mask on learning and psychosocial development, in consultation with teachers, parents/caregivers and/or medical providers." Those with disabilities must wear masks, no exceptions. There is a medical exemption limited to those with trouble breathing. Mainers who cannot wear a mask due to medical conditions unrelated to breathing difficulties, or due to psychological conditions, fall outside the exemption. They are currently cut-off from essential services, such as in-person doctor's visits, public education and grocery shopping. This discrimination is being encouraged by the Defendants, who have made violations of the mask requirements punishable as a Class E crime, who will fine businesses lax in their enforcement as much as $10,000, and who openly solicit "snitching."

96.    Those who insist that mask-wearing has been proven to be effective in slowing or stopping the spread of COVID-19 and is universally recommended according to the "science" are propagating false and misleading information. The federal CDC has admitted: "There is no scientific evidence for healthy people wearing masks." A September 2020 federal CDC study of confirmed COVID-19, symptomatic adults treated in academic outpatient clinics revealed that people who report wearing masks "always" or "often" are at 18 times the risk of developing COVID-19, compared to those who report wearing them "never" or "rarely."

97.    The results of the first randomized controlled trial evaluating the effectiveness of face masks against SARS-CoV-2 were published in November 2020. Danish scientists and physicians studied 6000 individuals at the University of

Copenhagen, and concluded that wearing a high quality surgical mask "did not reduce, at conventional levels of statistical significance, incident SARS-CoV-2 infection."  Among the study subjects who wore masks, 1.8% tested positive for SARS-CoV-2, compared to 2.1% among the control group.

98.     A study of tightly controlled U.S. Marine Corps recruits published in the New England Journal of Medicine in November 2020 came to the same conclusion.  2% of a group of 1,848 recruits tested positive for SARS-CoV-2, in spite of mandatory masking at all times, daily cleaning of rooms, sanitizing bathrooms with bleach wipes, maintaining 6 feet of distance, never leaving campus, avoiding items that might lead to surface-based transmission, and eating pre-plated meals.  Economist Brian Westbury assembled data from the COVID Tracking Project and YouGov.org showing that daily positive SARS-CoV-2 tests rose and fell precipitously despite mask-wearing being sustained continuously at 80%. Epidemiologists have noted that SARS-CoV-2 "is following the predictable bell-shaped pattern of epidemics predicted by Farr's law in 1840, regardless of mitigation efforts."

99.     The U.S. Surgeon General has stated: "Seriously people - STOP BUYING MASKS! They are NOT effective in preventing general public from catching #Coronavirus, but if healthcare providers can't get them to care for sick patients, it puts them and our communities at risk!"  And on another occasion he said: "Masks are not effective in preventing the general public from catching coronavirus."  NIAID Director Dr. Fauci has said: "People should not be walking around wearing masks.  Masks do not provide the protection people think they do."  He also said: "When you are in the middle of an outbreak, wearing a mask might make people feel a bit better, and it might even

block a droplet. But it is not providing the perfect protection that people think it is, and often there are unintended consequences…"  The FDA has said: "Even a properly fitted N95 mask does not prevent illness or death."  The California Department of Health has said: "There is limited evidence to suggest that use of cloth face coverings during a pandemic could help reduce disease transmission."

100.    The WHO "acknowledges that we lack evidence that wearing a mask protects healthy persons from SARS-CoV-2."  The WHO's "Advice on the Use of Masks in the Context of COVID-19" states that "[a]t present, there is no direct evidence (from studies on COVID-19 and in healthy people in the community) on the effectiveness of universal masking of healthy people in the community to prevent infection with respiratory viruses, including COVID-19."   The WHO also stated: "the widespread use of masks by healthy people in the community setting is not yet supported by high quality or direct scientific evidence and there are potential benefits and harms to consider."  Dr. Mike Ryan, Executive Director of the WHO's Health Emergencies Program, has stated: "There is no specific evidence to suggest that the wearing of masks by the mass population has any potential benefit.   In fact, there's some evidence to suggest the opposite in the misuse of wearing a mask properly or fitting it properly."  Researchers at Oxford University's Centre for Evidence-Based Medicine have stated: "despite two decades of pandemic preparedness, there is considerable uncertainty as to the value of wearing masks."   This is all very consistent with the position published in the New England Journal of Medicine, the premier medical journey in the country: "We know that wearing a mask outside health care facilities offers little, if any, protection from infection."

101.    Finally, as previously alleged, scientific studies show that asymptomatic transmission is extremely rare.  Since SARS-CoV-2 particles are 0.06 to 0.125 microns in size, and masks and respirators filter particles 0.3 to 0.8 microns in size, masks cannot possibly work.  Thus mandating masking for the healthy in public spaces is not likely to have any significant impact on overall rates of community spread.

102.    At the same time, face masks cause a range of serious physical and psychological harm.  They have been shown to raise resting blood pressure in both pregnant and non-pregnant women. They have been shown to reduce oxygen intake and increase carbon dioxide intake.  The increased carbon dioxide levels caused by mask-wearing can lead to cognitive impairment.  Wearing a mask can result in dangerously low blood oxygen levels.  The federal Occupational Safety and Health Administration ("OSHA") requires that employees breathe air consisting of at least 19.5% oxygen, and masks have been shown to reduce oxygen content by at least 20%, so that mask-wearers are receiving air with at most 16.2% oxygen.  OSHA states:

> Human beings must breathe oxygen . . . to survive, and begin to suffer adverse health effects when the oxygen level of their breathing air drops below [19.5 percent oxygen]. Below 19.5 percent oxygen . . . , air is considered oxygen-deficient. At concentrations of 16 to 19.5 percent, workers engaged in any form of exertion can rapidly become symptomatic as their tissues fail to obtain the oxygen necessary to function properly … Increased breathing rates, accelerated heartbeat, and impaired thinking or coordination occur more quickly in an oxygen-deficient environment. Even a momentary loss of coordination may be devastating to a worker if it occurs while the worker is performing a potentially dangerous activity, such as climbing a ladder. Concentrations of 12 to 16 percent oxygen cause tachypnea (increased breathing rates), tachycardia (accelerated heartbeat), and impaired attention, thinking, and coordination … even in people who are resting. At oxygen levels of 10 to 14 percent, faulty judgment, intermittent respiration, and exhaustion can be expected even with minimal exertion.

Masks have been shown to induce headaches in over 80% of wearers.

103.    German researchers studied reports made by parents and physicians into an online registry, regarding the effects of masking on 25,930 children who wore a mask on average 270 minutes each day.  60% of reports complained of irritability, 53% of headache, 50% of difficulty concentrating, 44% of reluctance to go to school, 42% of malaise, 38% of impaired learning, 37% of drowsiness or fatigue, 29.7% of shortness of breath, 26.4% of dizziness and 17.9% of being unwilling to move or play.  Face masks may have negative psychological impacts, particularly for children. Columbia University Professor of Psychiatry Kathleen Pike has stated:

> Many young children burst into tears or recoil when someone wearing a mask approaches....By putting on masks, we take away information that makes it especially difficult for children to recognize others and read emotional signs, which is unsettling and disconcerting. These issues may be especially true for children with autism spectrum disorder, including Asperger's syndrome, who tend to have particular difficulties reading non-verbal cues.

104.    Masks have a profoundly dehumanizing effect.  Over 60% of interpersonal communication is conveyed via non-verbal behaviors.  The mask hides non-verbal communication, distorts the structure of the face, and disguises identity.

105.    Masks increase the risk of contracting an infection.  The U.S. Surgeon General stated: "You can increase your risk of getting COVID-19 by wearing a mask if you are not a health care provider.  Folks who don't know how to wear them properly tend to touch their faces a lot and actually can increase the spread of coronavirus."  The United Kingdom's Deputy Chief Medical Officer stated: "For the average member of the public walking down a street, it is not a good idea.  In fact, you can actually trap the virus in the mask and start breathing it in."

### (3)    The Futility of Lockdowns

106.    In October 2020, WHO Special Envoy on COVID-19 Dr. David Nabarro stated: "We in the World Health Organization do not advocate lockdowns as the primary means of control of this virus.  The only time we believe a lockdown is justified is to buy you time to reorganize, regroup, rebalance your resources, protect your health workers who are exhausted, but by and large, we'd rather not do it."

107.    In January 2021, Stanford University scientists published a peer reviewed study in a medical journal concluding that the mandatory stay-at-home orders and business closures imposed in 8 countries including the United States have "no clear significant beneficial effect" versus voluntary measures adopted by countries such as Sweden and South Korea.

108.    In November 2020, French researchers analyzed data collected from 160 countries over the first 8 months of the pandemic, and concluded in a published study that "stringency of the measures settled to fight pandemia, including lockdown, did not appear to be linked with death rate."

109.    In July 2020, the peer-reviewed medical journal the <u>Lancet</u> published a study in which researchers collected data from 50 countries with the highest numbers of COVID-19 cases, and concluded that "government actions such as border closures, full lockdowns, and a high rate of COVID-19 testing were not associated with statistically significant reductions in the number of critical cases or overall mortality."

110.    In June 2020, researchers from Tel Aviv University published a study analyzing cell phone mobility data released by Apple, Inc. that found no statistical association between lockdown severity and the number of COVID-19 fatalities.  "We

would have expected to see fewer COVID-19 fatalities in countries with a tighter lockdown, but the data reveals that this is not the case."

111.    In May 2020, Oxford University's Blavatnik School of Government published a study of the lockdown countermeasures deployed by 17 different European governments called "The Results of Europe's Lockdown Experiment Are In."  The study concluded that "there's little correlation between the severity of a nation's restrictions and whether it managed to curb excess fatalities."

**E.     The Defendants' COVID-19 Mandates Have Wrought More Harm than COVID-19 Itself Has Caused**

112.    The real emergency the public confronts is one caused by the Emergency Mandates themselves, not by COVID-19.  The State bombards the public with misleading case and death counts, and terrorizes it with doomsday public health language and scenarios, but it has not similarly reported on data showing the economic and human costs inflicted by its Emergency Mandates.  There is no "unintended consequences" dashboard.  In addition to immediate harm, the Emergency Mandates will have trailing long-term costs that cannot be quantified at this time.

**(1)     The Economic Crisis Caused by the Emergency Mandates**

113.    The Emergency Mandates have caused extreme unemployment, collapsed consumer spending and widespread permanent business closures in Maine.   As a measure of economic damage, the overall unemployment rate is a significant indicator. In April 2019, Maine's unemployment rate was 2.6%.  It was steady at 3.1% in March 2020, but by the end of April 2020 had shot up to 9.1%.  It dropped to 5.1% in June 2020, and then spiked again to 8.8% the following month.  It was at 5% in December 2020.  In April 2020, Maine lost over 104,000 non-farm jobs, and by December 2020 less than half

of those had been recovered.  This is Maine's worst job loss dating back through 8 recessions to 1969.  As of January 2021, at least 124 businesses across Maine have permanently closed down, and that number excludes at least 24 canceled fairs and festivals that bring vital tourism revenues to towns and local businesses.  The true number of permanently closed businesses will not be known until the State publishes 2021 business license data.

114.    Tourism supports 110,000 jobs in Maine, representing 1 out of every 6 Maine jobs.  It is estimated that nearly 60% of Maine's total job losses are in the tourism sector.  A September 2020 Yelp Economic Impact Report revealed that restaurant and retail, among the businesses that serve the tourism sector, have suffered the greatest rate of business closures.   In the understatement of the year, Defendant Johnson stated in April 2020: "I think we may have misunderstood the complexity of the business side of some of this."

115.    Maine Department of Labor data show that southern Maine - which was targeted by State leaders in their Emergency mandates - has born the brunt of the economic damage from the shutdowns.  York County, where Plaintiff Kessler resides, has suffered from the third highest year-on-year increase in unemployment in the State.

116.    Maine hospitals are facing an unprecedented "financial tsunami" as the cancelation of elective and non-urgent procedures has forced them to lose as much as $250 million in revenues monthly, representing an average 50% decrease.  The hospitals have operated at 50% or less capacity, and have been forced to lay off and furlough workers and close physical facilities. Medical practices have seen their revenues drop as

much as 90%.   Thus the Emergency Mandates have damaged Maine's healthcare infrastructure far more than any threat posed by COVID-19.

### (2)  The Human Catastrophe Caused by the Emergency Mandates

117.   Maine is experiencing unprecedented food insecurity.  Maine's food banks are reporting "skyrocketing" demand.  Maine's Good Shepherd Food Bank estimates than an additional 40,000 Mainers will experience food insecurity due to the Emergency Mandates.

118.   Maine is experiencing unprecedented housing insecurity. A report from the Maine Affordable Housing Coalition found that Mainers are falling behind on their rent payments, burning through their savings, and skipping bills in order to remain housed.   "[T]he pressure is really building - more people are falling behind and they're hanging on by their fingernails."  One in three Maine households report being unable to meet basic household expenses, and 20,000 to 40,000 households are behind in their rent and at risk of eviction. The National Low Income Housing Association estimates Maine's rent shortfall at between $55,000,000 and $81,000,000.  Calls for legal assistance from Mainers facing eviction have increased statewide by more than 20% in the last three months.

119.   Unemployment takes a toll on the ability of individuals and families to sustain themselves, deprives them of dignity, and has been linked in peer reviewed studies to a 20-30% increase in suicides and mental health problems.  The negative emotions associated with joblessness and lockdown are known to trigger relapse and increased substance usage in substance abusers.

120.    Suicide and depression rates have increased dramatically – particularly in younger people. CDC Director Robert Redfield admitted: "But there has been another cost that we've seen, particularly in high schools. We're seeing, sadly, far greater suicides now than we are deaths from COVID. We're seeing far greater deaths from drug overdose that are above the excess that we had as background than we are seeing deaths from COVID."  A CDC study reported that depression in adults is four times higher than the previous year at 24.3% of people (compared to 6.5% in 2019), and the rate of suicidal ideation in adults has doubled compared to the previous year.  Psychological damage to children includes social isolation, inability to participate in athletics, instilling fear of people not wearing masks, and collapse of family relationships when children are not allowed to be close to grandparents and other relatives. These damages will be seen for at least a generation.  A 16 year-old teenager from Brunswick, Maine, Spencer Smith, made international headlines when he committed suicide, leaving a note explaining that he felt "locked in the house" and could not handle the social isolation caused by the Emergency Mandates.   Brunswick is within the geography specially targeted by the Emergency Mandates.

121.    Maine is experiencing unprecedented numbers of drug overdoses.  Maine recorded its worst year ever for drug overdoses in 2020, with 502 deaths.  January 2021 saw 58 confirmed cases, the highest monthly figure in at least a year.   The Maine Attorney General has published a Drug Death Report disclosing a horrifying 24% year-on-year increase in drug overdoses in Maine through September 2020.  This far exceeds the trend nationally of a 13% increase.  Drug deaths were the highest in southern Maine, the region targeted by the Emergency Mandates.

122.     Mainers have experienced unprecedented pressure on their mental and emotional health.  Calls to the Maine Crisis Line have increased by 20%, and calls to the Intentional Warm Line for less urgent needs have increased by 40%, since March 2020. The average time spent with each caller has increased by 50%.  The Program Director for Maine Crisis Line reports: "We're seeing not only an increase in calls but in the intensity of calls as well.  We're hearing from people who have never experienced mental health issues."  Wait lists for counseling have been as long as 10 weeks for adults, and 6 months for children.

123.     Maine domestic violence counselors have reported a 300% spike in calls with domestic violence victims during 2020, and time spent with each caller has increased substantially.  Shelters are holding 30% more victims.  Stay-at-home orders allow abusers to control, manipulate and isolate their victims.  Experts say the numbers are under-reported, since victims have fewer opportunities to report.   Alcohol plays a role in much domestic violence.  Online alcohol sales increased by 243% in Maine during 2020.  The New England Journal of Medicine recently discussed the "pandemic within the pandemic" of increased intimate partner violence. This type of violence has become far more pervasive when victims cannot escape their abusers in a no-travel, lockdown situation.  Maine experienced a 15% increase in sexual assault reporting in 2020.  The National Commission on COVID-19 and Justice found an 8.1% increase in domestic violence nationally, after studying crime reports, emergency hotlines and hospital data.

124.     Maine is experiencing an increase in child abuse and neglect.  Maine's Child Welfare Services Ombudsman indicates that child protective caseworkers investigated 13,500 reports of child abuse or neglect in 2020, a 12% increase over 2019.

The number of children in State custody increased by 9% in 2020.  Experts say the numbers are under-reported, since victims are isolated from third party mandatory reporters.  The federal CDC admits that "the social and economic effects of mitigation measures, such as loss of income, increased stress related to parental child care and schooling responsibilities, and increased substance abuse and mental health conditions among adults, increase the risk for child abuse and neglect."  The United Kingdom has experienced a 79% increase in reports of child abuse.

125.    Substantial evidence is accumulating that patients are avoiding treatments that could prevent more severe conditions. This has resulted and will continue to result in excess deaths because people fear getting the treatment they need.  The CDC estimates 93,814 non-COVID "excess deaths" in 2020 alone, nationally, including 42,427 from cardiovascular conditions, 10,686 from diabetes, and 3,646 from cancer, and many of these are caused by the cancellation of "non-essential" care in response to COVID-19. The Journal of the American Medical Association reported that the weekly number of newly diagnosed cancer patients has dropped by 46.4% nationally, for 6 major cancers for which early detection is paramount (including breast, colorectal and esophageal), since March 2020.  Even a 4-week delay in treatment is associated with increased mortality.  Cancer is already the leading cause of death in Maine.

126.    Parts of Maine have experienced an unprecedented increase in the number of homeless students.  South Portland is within the geography specially targeted by the Emergency Mandates.  The Superintendent has reported a drastic threefold increase in the number of homeless students in his district since March 2020, which he says is "absolutely related to the disruption and dislocation" caused by the Emergency Mandates.

Researchers have projected that the response to COVID-19 will cause chronic homelessness to increase 46% nationwide over the next 4 years.

127.    Parts of Maine are experiencing heightened school truancy, which superintendents attribute to difficulty with remote learning, lack of Internet access, lack of technology and fear of sickness.  8,000 Maine students and educators reported not having Internet access at home.  Many others report inadequate broadband for hosting conferences online.  The home environment is not optimal for learning in other cases. Grading was suspended due to concerns for fairness given the inequalities.  One Maine educator reports: "We also have kids that have gone silent, and they're not accessing anything, and I really worry, and as do our principals and our teachers and our guidance counselors on finding those kids."  Maine educators fear the "COVID-19 slide" – the loss of learning that occurs remotely.  National data from McKinsey suggests that on average students lost 3 months of learning in math, and 1.5 months of learning in reading. COVID-19 quaranatines have depleted Maine school staffs, forcing even more remote learning.  Almost 18% of Maine's 182,000 students are enrolled in special education. The Emergency Mandates have cut these special needs children off from the in-person one-on-one learning, occupational therapy, physical therapy and other specialist intervention they need in order to thrive, and have forced their untrained parents to assume primary responsibility for their education.

128.    In January 2021, the U.S. National Bureau of Economic Research estimated that the unemployment caused by COVID-19 mandates will cause 890,000 excess deaths in the United States over the next 15 years.

## VI.  COUNTS

### COUNT I

### DECLARATORY JUDGMENT
**Cessation of Emergency**

129.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

130.    In Home Building and Loan Association v. Blaisdell, 290 U.S. 398 (1934), the U.S. Supreme Court stated: "Whether an emergency exists upon which the continued operation of the law depends is always open to judicial inquiry."  290 U.S. at 442, citing Chastleton Corp. v. Sinclair, 264 U.S. 543 (1924).

131.    In Sinclair, the Supreme Court stated: "A law depending upon the existence of emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change."  264 U.S. at 547.

132.    Both Blaisdell and Sinclair are clear authority that an emergency and the rules promulgated thereunder must end when the facts of the situation no longer support the continuation of the emergency.

133.    They also forbid this Court to merely assume the existence of a "public health crisis" based on the pronouncements of the Defendants.  They are clear authority that it is the duty of the court of first instance to grapple with this question and conduct an inquiry.   "[A] Court is not at liberty to shut its eyes to an obvious mistake when the validity of the law depends upon the truth of what of what is declared."  Id.  The Sinclair court instructed lower court's to inquire into the factual predicate underlying a declaration of emergency, where there appears to have been a change of circumstances:

"the facts should be gathered and weighed by the court of first instance and the evidence preserved for consideration by this Court if necessary." 264 U.S. at 549.

134.    The Defendants' own data, the data produced by the federal CDC and the availability of multiple COVID-19 vaccines demonstrate an undeniable change in circumstances, and that the exigencies underlying the Emergency no longer exist, if they ever did.   Plaintiffs have accumulated and will present expert medical and scientific evidence further supporting this contention. If the exigencies no longer exist, then the Emergency and the Emergency Mandates must end.   Plaintiffs therefore seek a Declaratory Judgment terminating both the Emergency Mandates and the underlying Emergency upon which they depend.

135.    This Court has already rejected the State's earlier pleas to use the *de minimus* standard of review employed in Jacobson v. Massachusetts, 197 U.S. 11, 31 (1905).   Savage v. Mills, 478 F.Supp. 3d 16, 26 (D. Me. Aug. 7, 2020) ("Because the facts of that case are distinguishable — a different public health crisis in a different time, threatening different types of injuries to the Plaintiffs — I do not consider Jacobson to be a *de jure* immunity talisman, which is what it will be if judges routinely dismiss cases at the pleading stage based on the immediate evaluation of the merits of governmental action in derogation of constitutional rights. Nor am I convinced that Jacobson will be the Rosetta Stone for evaluating the merits of a challenge to any COVID-19-related government regulation."); Bayley's Campground, Inc. v. Mills, 463 F.Supp. 3d 22, 31 (D. Me. June 5, 2020) ("…it barely authorizes judicial review at all.").   Nor should the Court allow the Defendants to wall off from judicial scrutiny the underlying exigencies that are the justification for their prolonged Emergency, by shielding them with Jacobson non-

review.  An appropriate level of intermediate or strict scrutiny must be applied to this question.

136.   Plaintiffs therefore seek a Declaratory Judgment that the exigencies underlying the Emergency no longer exist, if they ever did; that the Emergency has ended; and that in the absence of a public health emergency, the Defendants lack any reason to continue to infringe on the civil liberties of the citizens of Maine, thereby nullifying all Emergency Mandates.

## COUNT II
## DECLARATORY JUDGMENT
### Separation of Powers
### (Maine Constitution)

137.   Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

138.   Article III of the Maine Constitution summarizes the separation-of-powers principle in Maine as follows:

> Section 1.  Powers distributed.  The powers of this government shall be divided into 3 distinct departments, the legislative, executive and judicial.
>
> Section 2.  To be kept separate.  No person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted.

ME. CONST. art. III, §§ 1-2.

139.   As a threshold matter, no provision of the Maine Constitution can be said to have "expressly directed or permitted" the Defendants to exercise, as they have for an entire year, the sweeping legislative powers represented by the comprehensive, detailed, substantive Emergency Mandates.   On the contrary, when forming their Constitution, the

60

people of Maine expressly reserved to themselves, and not to the Executive, the power to legislate directly.  Article IV, Section 1 of the Maine Constitution states: "…the people reserve to themselves power to propose laws and to enact or reject the same at the polls independent of the Legislature…"  Thus an amendment to the Maine Constitution was required in order to authorize the Emergency Mandates.  The only method by which the Maine Constitution may be amended, is set forth in Article X, Section 4.  MEMA was not passed in accordance with Article X, Section 4, and did not itself amend the Maine Constitution.

140.    Even if no constitutional amendment were required, the non-delegation doctrine renders the Maine Emergency Management Act unconstitutional.  In Midwest Inst. of Health, PLLC v. Governor of Mich. (In re Certified Questions from the United States Dist. Court), 2020 Mich. LEXIS 1758 * 43-43, the Supreme Court of Michigan held that Michigan's Emergency Powers of the Governor Act of 1945 ("EPGA") effects an unconstitutional delegation of legislative authority to Governor Gretchen Whitmer.  It analyzed the EPGA in terms of three traditional non-delegation criteria: subject matter scope, durational scope and standards.  Id. at * 24-61.  The table below succinctly compares the EPGA and the Maine Emergency Management Act ("MEMA"), Title 37-B of the Maine Revised Statutes, Chapter 13, across these criteria.  While there are some differences in language and structure, in substance and effect the two statutes are the same.

|  | EGPA | MEMA |
|---|---|---|
| Subject Matter Scope | "[E]xhibit a sweeping scope, both with regard to the subjects covered and the power exercised over those subjects" | The public policies effected by Governor Mills through Executive Orders issued under MEMA "exhibit a sweeping scope" |

| | | |
|---|---|---|
| Durational Scope | "[M]ay conceivably"[7] be delegated indefinitely, since Governor has power to declare and terminate, absent legislative action | Under MEMA, the Maine Legislature's legislative power "[m]ay conceivably" be delegated indefinitely, since Governor Mills has power to declare, renew and terminate the Emergency absent a joint resolution |
| Standards | All powers subject to standards "reasonable" and "necessary"[8] | Some of the powers delegated to Governor Mills in MEMA are subject to a "reasonably necessary" standard, some to a "necessary" standard and some to no intelligible standard or principle at all |

141.    The Michigan court's summary of the substance of the executive orders issued by Governor Whitmer under EPGA, shows that they are virtually identical to the Executive Orders issued by Governor Mills under MEMA in their breadth and scope of subject matter:

> To illustrate the breadth of the emergency powers contemplated by the EPGA, we note that during the COVID-19 pandemic the Governor has, by way of executive orders specifically issued under the EPGA, effected the following public policies: *requiring* all residents to stay home with limited exceptions; *requiring* all residents to wear face coverings in indoor public spaces and when outdoors if unable to consistently maintain a distance of six feet or more from individuals who are not members of their household, including requiring children to wear face coverings while playing sports; *requiring* all residents to remain at least six feet away from people outside one's household to the extent feasible under the circumstances; *requiring* businesses to comply with numerous workplace safeguards, including daily health screenings of employees; *closing* restaurants, food courts, cafes, coffeehouses, bars, taverns,

---

[7] Id. at * 36-44 ("Thus, under the EPGA, the state's legislative authority, including its police powers, may conceivably be delegated to the state's executive authority for an indefinite period.").

[8] Id. at * 43-43 ("The powers conferred by the EPGA simply cannot be rendered constitutional by the standards 'reasonable' and 'necessary,' either separately or in tandem.").

brew pubs, breweries, microbreweries, distilleries, wineries, tasting rooms, clubs, hookah bars, cigar bars, vaping lounges, barbershops, hair salons, nail salons, tanning salons, tattoo parlors, schools, churches, theaters, cinemas, libraries, museums, gymnasiums, fitness centers, public swimming pools, recreation centers, indoor sports facilities, indoor exercise facilities, exercise studios, spas, casinos, and racetracks; *closing* places of public amusement, including arcades, bingo halls, bowling alleys, indoor climbing facilities, skating rinks, and trampoline parks; *prohibiting* nonessential travel, in-person work that is not necessary to sustain or protect life, and nonessential in-person business operations; *prohibiting* the sale of carpet, flooring, furniture, plants, and paint; *prohibiting* advertisements for nonessential goods, nonessential medical and dental procedures, and nonessential veterinary services; *prohibiting* visitors at healthcare facilities, residential care facilities, congregate care facilities, and juvenile justice facilities; and *prohibiting* boating, golfing, and public and private gatherings of persons not part of a single household.

Id. at * 32-34.

142.    Under MEMA, emergencies are declared by the Governor for a period of up to 30 days, by unilateral proclamation. 37-B M.R.S. § 742(1)(A).  The Governor may renew the emergency, presumably by further proclamation, and presumably only for a further 30 days, though neither the precise method of renewal nor the renewal period is expressly stated in MEMA.  37-B M.R.S. § 743(2).  The Governor has the power to terminate an emergency that she has declared, by further proclamation. 37-B M.R.S. § 743(1).  The Legislature, by joint resolution, may also terminate an emergency.  37-B M.R.S. § 743(1).  MEMA does not provide any kill switch for ending the stand-off that could occur were the Legislature determined to end an emergency and voted to do so, and the Governor determine to continue it and proclaimed it anew.  Nor does it provide any solution for addressing the problem that arises when the Legislature has been adjourned due to the emergency.

143.    Governor Mills proclaimed the Emergency on March 15, 2020.   The Legislature adjourned 3 days later, on March 18, 2020.  Governor Mills then renewed the

Emergency 11 times, again by proclamation, during which time the Legislature has never been reconvened, and therefore could not have terminated the emergency.

144.    The Governor has the power to convene the Legislature: "The Governor may, on extraordinary occasions, convene the Legislature…"  ME. CONST. art. V, § 13. However, the Governor is not required to convene the Legislature, and has declined to do so.  The Legislature can also convene itself: "The Legislature may convene at such other times on the call of the President of the Senate and Speaker of the House, with the consent of a majority of the Members of the Legislature of each political party, all Members of the Legislature having been first polled."   ME. CONST. art. IV, § 1. However, since the President of the Senate and the Speaker of the House are members of the Governor's own political party, which controls both the Senate and the House with a clearly dominant majority, the Legislature has not convened itself.   Thus in theory the Emergency is interminable.

145.    The Michigan court rejected the standards "reasonable" and "necessary" as illusory.  "The consequence of such illusory 'non-standard' standards in this case is that the Governor possesses free rein to exercise a substantial part of our state and local legislative authority…."  Inst. of Health, PLLC, 2020 Mich. LEXIS at * 42.  Those illusory standards are the only discernable standards in MEMA, and they only apply in a few specific instances.

146.    Plaintiffs therefore seek a Declaratory Judgment that the MEMA provisions specifically relied upon by the State in promulgating its Emergency Mandates, including without limitation 37-B M.R.S. §§ 741, 742(1) and 743, are an unconstitutional delegation of legislative power.

## COUNT III

## DECLARATORY JUDGMENT

### Constitutional Right to Travel

### (U.S. Constitution)

147.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

148.    The U.S. Supreme Court has held that the "'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence." Saenz v. Rose, 526 U.S. 489, 498 (1999) (quoting United States v. Guest, 383 U.S. 745, 757 (1966)).  This right is "virtually unconditional." Id. (quoting Shapiro v. Thompson, 394 U.S. 618, 643 (1969)).

149.    This Court has found, already, that the Emergency Mandates *do* burden and impinge Mainers' fundamental constitutional right to travel.  Bayley's Campground, Inc. v. Mills, 463 F.Supp. 3d 22, 35 (D. Me. June 5, 2020) ("…it is clear that Maine's Quarantine Restrictions burden Plaintiffs' 'right to travel'").

150.    The Court declined in June 2020 - the "early stage," alternatively the "nascent stage," when the court was being asked to rule "without a developed factual record" – to grant the injunctive relief requested by the Plaintiffs in Bayley's Campground.  Id.  However, it noted that "'[c]onditions on the ground can change quickly'" Id. at 34.  "[A] restriction that is inherently prejudicial to interstate traffic regardless of circumstance can only be condoned in the face of a dire hazard and, even then, tolerated only so long as the hazard is paramount.  Any other approach would not be a narrowly tailored exercise of the police power."  Id. at 33.

151.    Plaintiffs have demonstrated on the face of this Complaint that the "hazard," assuming it ever existed to a degree justifying the Emergency and the Emergency Mandates, no longer exists.   Meanwhile, the Emergency Mandates have inflicted grievous injuries on Plaintiffs and countless other Mainers.

152.    As a direct and proximate result of the Emergency Mandates, Plaintiffs Jere Gray and her minor son EG cannot travel to and from Boston, so that EG can be treated by the medical specialists in Boston who know him intimately and have treated his complex medical condition for years, using a treatment not available in Maine.   Due to the lack of treatment, EG has regressed profoundly.   This is not merely a "burden," it is inhumane.

153.    As a direct and proximate result of the Emergency Mandates, Plaintiff Kessler's paying interstate clientele have been either outright banned or as a practical matter banned from traveling to Maine.   Even now, all travelers except those originating from New Hampshire and Vermont are subject to the quarantine and testing requirements.   Ms. Kessler's revenues have evaporated, and she is on the verge of defaulting on her mortgage loan, losing her life's savings, losing the business that was her dream, and losing her home.   Ms. Kessler has *jus tertii* standing to assert a constitutional challenge to the Emergency Mandates burdening interstate travel.

154.    Plaintiffs therefore seek a Declaratory Judgment that the Emergency Mandates unconstitutionally infringe upon Plaintiffs' rights to interstate travel.

## COUNT IV
### DECLARATORY JUDGMENT

**Constitutional Right to Free Exercise of Religion, Right of Association, Equal Protection**

**(U.S. Constitution, Maine Constitution)**

155.   Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

156.   The religion clauses in the 1st Amendment of the U.S. Constitution say: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. CONST., amend. I.

157.   Closely related to free exercise, the courts have recognized a freedom of expressive association.  "[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, *religious*, and cultural ends."  Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984).

158.   "Government is not free to disregard the First Amendment in times of crisis.  *At a minimum*, that Amendment prohibits government officials from treating religious exercises worse than comparable secular activities, unless they are pursuing a compelling interest and using the least restrictive means possible."  Roman Catholic Diocese v. Cuomo, 141 S.Ct. 63, 69 (2020) (emphasis added).

159.   Further, Article I, Section 3 of the Maine Constitution states:

All individuals have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences, and no person shall be hurt, molested or restrained in that person's liberty or estate for worshipping God in the manner and season most agreeable to the dictates of that person's own conscience, nor for that person's religious professions or sentiments, provided that that person does not disturb the public peace, nor obstruct others in their religious worship; -- and all persons demeaning themselves peaceably, as good members of the State, shall be equally under the protection of the laws…

ME. CONST. art. I, § 3.  This free exercise clause is far more detailed than the 1st Amendment.  It "has been described as guaranteeing 'absolute freedom of religion'" and

provides even greater protection for the free exercise of religion than that provided under the U.S. Constitution.[9]  It exists to protect the unalienable free exercise rights of Maine's Catholics and other religious believers who suffer oppression through the application of purportedly "neutral" laws that burden their religious beliefs, practice and conduct.

160.    As a direct and proximate result of the Emergency Mandates, Plaintiffs Mrs. Jenkins, EJ and AJ have been burdened in the free exercise of their faith, and related rights of association.

161.    Plaintiffs therefore seek a Declaratory Judgment that the Defendants have violated their fundamental 1st Amendment right to the free exercise of religion and related freedom of association, deprived them of the equal protection of the laws under the Equal Protection Clause of the 14th Amendment, and violated the Maine Constitution.

## COUNT V

## DECLARATORY JUDGMENT

**Constitutional Right to Political Speech and Peaceable Assembly,
Right of Association, Equal Protection**

**(U.S. Constitution)**

162.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

163.    The 1st Amendment to the U.S. Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people to peaceably

---

[9]  Joshua Dunlap, *A Venerable Bulwark: Reaffirming the Primacy Approach to Interpreting Maine's Free Exercise Clause*, 73 ME. L. REV. 1, 13, 32 (2021) ("As a matter of state constitutional interpretation, the Law Court has correctly declined to follow the vagaries of the Supreme Court's free exercise jurisprudence, instead recognizing that Maine's Declaration of Rights provides greater protection for the free exercise of religion than that provided under the United States Constitution.").

assemble, and to petition the government for a redress of grievances."  U.S. CONST., amend. I.

164.    As explained in Count II, MEMA interacts with Article V, Section 13 and Article IV, Section 1 of the Maine Constitution in a manner that excludes the minority opposition party and its Senators and Representatives – in other words, in a manner that excludes minority, dissenting, political speech – from the formal political process, possibly for an indefinite time.  This is an extremely dangerous flaw in Maine's constitutional framework.

165.    It is not a theoretical concern.  Plaintiff Rep. Sampson belongs to the principal minority opposition party in Maine.  At least twice after the Legislature adjourned in March 2020, Rep. Sampson and her party (both House and Senate caucuses) asked the President of the Senate and Speaker of the House to convene the Legislature for the purpose of scrutinizing MEMA, the Emergency and the Emergency Mandates.  The President of the Senate and Speaker of the House refused to convene for that purpose, but were willing to convene for other purposes.  Thus the majority dominant political party shut down the Legislature, blocking the peaceable assembly of the minority opposition party and stifling dissenting political speech, while their Governor and unelected executive branch officials wielded legislative power unchecked.

166.    "[P]olitical advocacy," of all forms of speech, is the "kind of speech that the First Amendment is meant to protect most vigorously."[10]  Even further, "[t]he First Amendment does not protect a 'freedom to speak.'  *It protects the freedom of those activities of thought and communication by which we 'govern.'  It is concerned, not*

---

[10] Laurence Tribe, *Dividing Citizens United: The Case v. The Controversy*, 30 CONST. COMMENT. 463, 467 (2015).

**with a private right, but with a public power, a governmental responsibility**" (emphasis added).[11]

167.    The U.S. Supreme Court has emphasized that political speech "is entitled to the most exacting degree of First Amendment protection," FCC v. League of Women Voters, 468 U.S. 364, 375-76 (1984), and is the type of speech to which the "the First Amendment 'has its fullest and most urgent application.'" McCutcheon v. FEC, 572 U.S. 185, 191 (2014) (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272 (1971)).    In Bond v. Floyd, 385 U.S. 116, 135-136 (1966), the Supreme Court ruled that the Georgia House of Representatives violated the 1st Amendment's protection of political speech when it refused to permit an elected representative to take the oath of office and enter the legislature, on the ground that he dissented from the Vietnam War:

> The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy…Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them.

168.    "The right of free and peaceable assembly for lawful purpose and in a manner without governmental interference or hindrance is a fundamental right, of the very essence of democracy, and is guaranteed under the First Amendment." C.J.S., Constitutional Law § 134.   It is a crucial legal protection for dissenting groups.

169.    Plaintiff Rep. Sampson, and her constituents Plaintiffs Jere Gray, EG and Valerie Kessler, therefore seek a Declaratory Judgment that the Defendants have violated their First Amendment rights to political speech and peaceable assembly and related

---

[11] Alexander Meiklejohn, *The First Amendment is an Absolute*, 1961 SUP. CT. REV. 245, 255.

freedom of association, and deprived them of the equal protection of the laws under the Equal Protection Clause of the 14th Amendment.

## COUNT VI

### DECLARATORY JUDGMENT
### Takings Without Just Compensation

### (U.S. Constitution)

170.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

171.     "[A] regulation which denies all beneficial or productive use" will require compensation under the Takings Clause.  Murr v. Wisconsin, 137 S.Ct. 1933, 1942-1943. Further and separately, "when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on 'a complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action."  Id.

172.    Plaintiff Kessler purchased the Jeremiah Mason House solely for the purpose of operating the Bed and Breakfast, on the basis that it has been operated successfully as such since at last 1996.  She owns the fee simple title to the building outright, in her own name.  The Emergency Mandates have deprived her of all economically beneficial use of the property.  Alternatively, they have interfered with her investment-backed expectations.  She is on the threshold of bankruptcy.

173.    The "Rural Reopening" component of the Emergency Mandates is unlawfully discriminatory.  Similarly situated businesses based elsewhere in the State suffered under fewer or no restrictions, in spite of the fact that they provided the same

services to the same interstate travelers.  The distinction between these geographies is arbitrary, capricious and irrational.

174.     Plaintiff Kessler therefore seeks a Declaratory Judgment that the Defendants have taken her property without just compensation in violation of the 5th Amendment to the U.S. Constitution, and deprived her of the equal protection of the laws under the Equal Protection Clause of the 14th Amendment.

## COUNT VII
## DECLARATORY JUDGMENT
### Substantive Due Process

### (U.S. Constitution)

175.     Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

176.     In Planned Parenthood v. Casey, 505 U.S. 833, 857, the U.S. Supreme Court stated:

> Roe, however, may be seen not only as an exemplar of Griswold liberty, but as a rule (whether or not mistaken) of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection.  If so, our cases since Roe accord with Roe's view that a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims. Cruzan v. Director, Mo. Dept. of Health, 497 U.S. 261, 278, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990); cf., e. g., Riggins v. Nevada, 504 U.S. 127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992); Washington v. Harper, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990); see also, e. g., Rochin v. California, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952); Jacobson v. Massachusetts, 197 U.S. 11, 24-30, 49 L. Ed. 643, 25 S. Ct. 358 (1905).

To reiterate: "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims."

177.     If a state's interest in the protection of life falls so short of being able to override individual liberty interests that it may not be used to prevent the killing of an

unborn child, how then can the State argue that it may forgo those interests in an attempt to force ineffective and unproven methods of preventing and/or treating COVID-19, a disease that has a 99.875% overall recovery rate?   It cannot.

<u>Right to Personal Autonomy and Bodily Integrity</u>

178.    The Supreme Court has stated that the protected liberty claims inherent in personal autonomy and bodily integrity include both the right *to be free from* unwanted medical intervention, and the right *to obtain* medical intervention:

> As the joint opinion acknowledges, *ante*, 505 U.S. at 857, this Court has recognized the vital liberty interest of persons in refusing unwanted medical treatment. <u>Cruzan v. Director, Mo. Dept. of Health</u>, 497 U.S. 261, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990). Just as the Due Process Clause protects the deeply personal decision of the individual to *refuse* medical treatment, it also must protect the deeply personal decision to *obtain* medical treatment, including a woman's decision to terminate a pregnancy.

Id. at 927.

179.    The Emergency Mandates have forced all Plaintiffs to wear face masks against their will, and subject to criminal prosecution.  Face masks are a medical device. The FDA states: "The FDA regulates face masks, including cloth face coverings, and surgical masks as medical devices when they are marketed for medical purposes. Medical purposes include uses related to COVID-19, such as face masks to help stop the spread of disease…"  Face masks cause psychological harm to children. They reduce blood oxygen levels to dangerously low levels, and can cause tooth decay.  There is no scientifically reliable evidence that they are effective in stopping the transmission of SARS-CoV-2.

180.    The Emergency Mandates have blocked Plaintiff EG from consulting with his team of integrated specialist healthcare providers in Boston. They have prevented him from receiving the medical treatment that he needs.  They have cut off his access to the

occupational and physical therapy that he needs.  They have forced him to suffer unnecessarily with his extreme disability, and to regress, without medical care.

Right to Work

181.    The 14th Amendment guarantees a citizen's right to work for a living and support herself by pursuing a chosen occupation.  Board of Regents v. Roth, 408 U.S. 564, 572 (1972); Truax v. Raich, 239 U.S. 33, 41 (1915) ("It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [14th] Amendment to secure.").

182.    Federal district courts adjudicating challenges to State COVID-19 mandates have acknowledged this right, and subjected mandates that implicate it to constitutional review. City of Butler v. Wolf, 2020 U.S. Dist. LEXIS 167544 * 82 ("The nature of a state-wide shut down of 'non-life-sustaining' business is such an immediate and unprecedented disruption to businesses and their employees as to warrant constitutional review.").

183.    In holding that Pennsylvania's closure of all "non-life-sustaining" businesses "was so arbitrary as to violate the Business Plaintiffs' substantive due process rights guaranteed by the Fourteenth Amendment," the Butler court stated:

> The Court recognizes that Defendants were facing a pressing situation to formulate a plan to address the nascent COVID-19 pandemic when they took the unprecedented step of *sua sponte* determining which businesses were "life-sustaining" and which were "non-life-sustaining."  But in making that choice, they were not merely coming up with a draft of some theoretical white paper, but rather, determining who could work and who could not, who would earn a paycheck and who would be unemployed – and for some – which businesses would live, and which would die. This was truly unprecedented. An economy is not a machine that can be shut down and restarted at will by government. It is an

organic system made up of free people each pursuing their dreams. The ability to support oneself is essential to free people in a free economy.

Id. at 91-92.

184.    Without the right to work in a profession of our own choosing, rather than being directed into a profession by the State, or directed not to work and placed on subsidies by the State, we are slaves.  The Emergency Mandates have deprived Plaintiff Kessler of her right to work and chosen occupation, forcibly closing her "non-essential" bed and breakfast business, and then crippling the business by making it for a time *de jure* and then *de facto* impossible for interstate travelers to make reservations and travel to her business.  She is now on the verge of bankruptcy and homelessness.

Freedom of Movement

185.    Separate and apart from the right of travel, there is a fundamental right to move about freely in the public. City of Chicago v. Morales, 527 U.S. 41, 53-54, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (striking down an antiloitering ordinance aimed at combatting street gangs and observing that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment."); Papachristou v. Jacksonville, 405 U.S. 156, 164-65, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972) (citing a Walt Whitman poem in extolling the fundamental right to loiter, wander, walk or saunter about the community); Bykofsky v. Middletown, 429 U.S. 964, 97 S. Ct. 394, 50 L. Ed. 2d 333 (1976) (Marshall, J., dissenting) ("The freedom to leave one's house and move about at will is of the very essence of a scheme of ordered liberty, . . . and hence is protected against state intrusions by the Due Process Clause of the Fourteenth Amendment.") (internal citation and quotation marks omitted)); Waters v. Barry, 711 F. Supp. 1125, 1134 (D.D.C. 1989) (referencing Papachristou and stating

"[t]he right to walk the streets, or to meet publicly with one's friends for a noble purpose or for no purpose at all—and to do so whenever one pleases—is an integral component of life in a free and ordered society.").

186.   When in place, these Defendants' "Stay at Home" orders "require[] a *default* of confinement at home, unless a citizen is out for a purpose approved by Defendants' orders.  Moreover, this situation applied for an indefinite period of time. This broad restructuring of the default concept of liberty of movement in a free society eschews any claim to narrow tailoring." Butler, 2020 U.S. Dist. LEXIS 167544 * 71-72.

### Public Education

187.   The U.S. Supreme Court has held that "the denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit."  Plyler v. Doe, 457 U.S. 202, 221-222 (1982).  Plyler involved undocumented aliens, who are not a suspect class.  Id.  If the state cannot deny undocumented aliens an education, it cannot deny children suffering with disabilities an education.

188.   And yet, a significant number of Maine's school aged children, like Plaintiff EG, suffer with disabilities that make their compliance with the social distancing and masking requirements in the Emergency Mandates impossible, and preclude them from learning remotely.  Even a limited interruption of in-person learning can have a profoundly destructive impact on children with disabilities.  The Emergency Mandates make no exception for these children, and deprive them of public education.  "The inestimable toll of that deprivation on the social, economic, intellectual and psychological

well-being of the individual, and the obstacle it poses to individual achievement, make it most difficult to reconcile the cost" of the Emergency Mandates.  Id.

189.   Plaintiffs therefore seek a Declaratory Judgment that the Defendants have violated their constitutional rights to personal autonomy and bodily integrity, work, freedom of movement and education, under the Substantive Due Process Clause of the 14th Amendment.

## COUNT VIII

### DAMAGES

### (42 U.S.C. § 1983)

1.   Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference as if fully set forth herein.

2.   Civil money damages are available under 42 U.S.C. § 1983 where plaintiffs can show a clear constitutional violation, and have sued government employees in their personal capacities.  Tanzin v. Tanvir, 141 S.Ct. 486, 490 (2020) ("[42 U.S.C. § 1983 applies to 'person[s] acting under color of any statute' and this Court has long interpreted it to permit suits against officials in their individual capacities.").

3.   Defendants, under color of MEMA and the Emergency Mandates, have injured Plaintiffs by depriving them of clearly established constitutional rights, privileges and immunities of which a reasonable person would have known, in all of the ways alleged in this Complaint.

## VII.  PRAYER FOR RELIEF

WHERFORE, and for the foregoing reasons, Plaintiffs request that this Court:

(A)   Declare that the exigencies underlying Governor Mills' initial emergency proclamation no longer exist, if they ever did; and in the absence of a

public health emergency, the state lacks any reason to continue to infringe on the rights of the citizens of Maine, thereby nullifying the Emergency and the Emergency Mandates;

(B)    Declare that MEMA violates the Separation of Powers required by Article III of the Maine Constitution, thereby nullifying the Emergency and the Emergency Mandates;

(C)    Declare that the Emergency Mandates violate the constitutional right to travel of Plaintiffs EG and Jere Gray, Plaintiff Kessler and her interstate clientele, and all Plaintiffs;

(D)    Declare that the Emergency Mandates violate the constitutional right to free exercise of religion of Plaintiffs Jennifer Jenkins, EJ and AJ, and their right to the equal protection of the laws;

(E)    Declare that the Emergency Mandates violate the constitutional right to political speech and peaceable assembly of Plaintiff Rep. Sampson and her constituents Plaintiffs EG, Jere Gray and Kessler, and their right to the equal protection of the laws.

(F)    Declare that the Emergency Mandates effect an unconstitutional taking of Plaintiff Kessler's property without just compensation.

(G)    Declare that the Emergency Mandates violate the constitutional right of all Plaintiffs to personal autonomy and bodily integrity, lawful occupation, freedom of movement and public education.

(H)    Enjoin the enforcement of the unconstitutional aspects of the challenged Emergency Mandates;

(I)    Enjoin the use of PCR test results as the basis for determining public health responses and restrictions unless and until it is proven by the Defendants that this test is reliable and accurate at the cycle thresholds being used in Maine;

(J)    Award to each of the Plaintiffs, under 42 U.S.C. § 1983, compensatory damages, including both economic and non-economic damages, against the Defendants; and

(K)    Award Plaintiffs such other and additional relief as the Court deems fit.

## VIII.  JURY DEMAND

Plaintiffs request a jury trial on all issues so triable, including without limitation the quantum of damages.

Dated: March 9, 2021.                 Respectfully submitted,

By:     /s/  *F. R. Jenkins*

F. R. Jenkins, Esq. (Maine Bar No. 004667)
MERIDIAN 361 INTERNATIONAL LAW
GROUP, PLLC
97A Exchange Street, Suite 202
Portland, ME 04101
Tel. 866-338-7087
*Attorneys for Plaintiffs*

Thomas Renz, Esq. (Ohio Bar No. 98645)
RENZ LAW, LLC
1907 W. State Street, Suite 162
Fremont, OH 43420
Tel. 419-351-4248
*Attorneys for Plaintiffs*
*(Admission Pending Pro Hac Vice)*